**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                     CR No. 09-3457 JP

BRAD AHRENSFIELD,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

On April 21, 2010, after the United States completed the presentation of its case-in-chief, Defendant Brad Ahrensfield ("Ahrensfield") filed Defendant Brad Ahrensfield's Motion for Judgment of Acquittal on the Charge of Obstruction of Justice Under Fed. R. Crim. P. 29 (Doc. No. 45).[1]  The Court reserved ruling on Ahrensfield's Motion and submitted the case to the jury.  (Trial Tr. 404:18-20, 405:23-24.)  At the conclusion of the trial, the jury was not able to reach a verdict on the charge of obstruction of justice, (Verdict, Doc. No. 57), and thus Ahrensfield's Motion remained pending.

Because Ahrensfield filed his Motion during trial, he did not have available a transcript of the proceedings to which he could cite to support his arguments. Consequently, on June 3, 2010, the Court ordered the parties to submit supplemental briefing on Ahrensfield's Motion with specific citations to the trial transcript to facilitate the Court's analysis of the arguments Ahrensfield raised in support of his Motion.  On

---

[1] Ahrensfield also filed Defendant Brad Ahrensfield's Motion for Judgment of Acquittal on the Charge of False Statements Under Fed. R. Crim. P. 29 (Doc. No. 44), but in light of the jury's not guilty verdict on that charge, the Court has already found that Motion moot.  (Order, Doc. No. 70.)  Additionally, the Court notes that Ahrensfield initially presented both motions orally.

June 15, 2010, Ahrensfield filed Defendant Brad Ahrensfield's Motion for Judgment of

Acquittal on the Charge of Obstruction of Justice Under Fed. R. Crim. P. 29

("Motion")(Doc. No. 71), which, although it bears the same title as the original motion,

is in fact Ahrensfield's supplemental motion that includes specific citations to the trial

transcript.  Then, on July 13, 2010, the United States filed United States' Opposition to

Motion for Judgment of Acquittal ("Response")(Doc. No. 75).  Finally, on July 22, 2010,

Ahrensfield filed Defendant Brad Ahrensfield's Reply in Support of His Motion for

Judgment of Acquittal on the Charge of Obstruction of Justice Under Fed. R. Crim. P. 29

("Reply")(Doc. No. 76).  Having considered the parties' briefs and the applicable law, the

Court finds that Ahrensfield's Motion should be denied.

## DISCUSSION

### I.    The Law Governing Motions Under Fed. R. Crim. P. 29

Ahrensfield moves under Fed. R. Crim. P. 29 for a judgment of acquittal on the

obstruction of justice charge, arguing generally that the evidence adduced at trial was

insufficient to support a conviction on that charge.  In deciding a motion for judgment

of acquittal based on alleged insufficient evidence, the Court's central inquiry is

"whether a reasonable jury could find [the] defendant guilty beyond a reasonable doubt,

viewing the evidence in the light most favorable to the government and drawing

reasonable inferences therefrom." *United States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir.)

*cert denied*, ___ U.S. ___, 129 S. Ct. 281, 172 L. Ed. 2d 149 (2008).  It is not the Court's

role to "weigh conflicting evidence nor consider the credibility of witnesses." *United*

*States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004).  "Instead, [the Court]

must simply determine whether [the] evidence, if believed, would establish each

element of the crime." *Id.* (internal citation and quotation marks omitted, second alteration in original).  Additionally, in conducting its inquiry, the Court must be mindful that "[w]hile the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable, and caution must be taken that [a] conviction not be obtained by piling inference on inference." *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995)(internal citation and quotation marks omitted).  Indeed, the evidence "must do more than raise a suspicion of guilt," *United States v. Rakes*, 510 F.3d 1280, 1284 (10th Cir. 2007), and "[a] jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility," *Jones*, 44 F.3d at 865 (internal citation and quotation marks omitted).  However, while "the evidence . . . must be substantial, . . . it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Phillips*, 583 F.3d 1261, 1264 (10th Cir. 2009)(internal citation and quotation marks omitted).

As discussed above, Ahrensfield presented his Motion at the conclusion of the United States' case-in-chief in accordance with Fed. R. Crim. P. 29 (a).  As it is permitted to do under Fed. R. Crim. P. 29 (b), the Court reserved ruling on Ahrensfield's Motion and submitted the case to the jury.  (Trial Tr. 404:18-20, 405:23-24.)  Rule 29 (b) provides that "[i]f the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved."  The Court will conduct its review of the evidence accordingly, reviewing only the evidence presented during the United States' case-in-chief.

## II.     The Evidence Adduced in the United States' Case-in-Chief

The jury learned that in September 2009, members of Operation Safe Streets, a multi-agency task force involving, among others, the Albuquerque Police Department ("APD") and the Federal Bureau of Investigation ("FBI"), began an investigation into possible criminal activity at an Albuquerque business known as Car Shop. (Trial Tr. 54:10-20, 56:19 - 63:14.)  Specifically, the investigation focused on alleged drug dealing and trafficking of stolen property by Car Shop employees and the role, if any, of Car Shop's owner, Shawn Bryan, in that illegal activity.  (*See id.* at 61:23 - 62:12.)  This investigation was made all the more interesting by Car Shop's status as the provider of automotive services for the APD's undercover vehicles. (*Id.* at 56:23 - 57:10.)

FBI Special Agent Matthew Boyden and APD Sergeant Ryan Buckner led the Car Shop investigation.  (*See id.* at 53:24-25, 63:1-12.)  Together, Special Agent Boyden and Sgt. Buckner devised a plan for the investigation in which they would use the confidential informant ("CI") who had provided the initial tips about potential illegal activity at Car Shop to conduct "small, controlled purchases from one of the employees at the Car Shop to corroborate the information that [the CI] had told [Sgt. Buckner]." (*Id.* at 63:24 - 64:2.) The goal of these controlled purchases was two-fold.  First, Special Agent Boyden and Sgt. Buckner wanted to "make sure what [the CI] said was true and was actually happening."  (*Id.* at 64:6-7.)  Second, assuming the information was true, the goal of the investigation was "to eventually obtain charges on the mechanic at [Car Shop], to then in turn see if he would be willing to provide information about the criminal activity at the Car Shop and others involved." (*Id.* at 64:9-12.)  Furthermore, along with these controlled purchases, Sgt. Buckner planned to conduct a financial

4

investigation of Shawn Bryan.  (*Id.* at 65:22 - 66:20.) Ultimately, Special Agent Boyden and Sgt. Buckner, through the information obtained from the controlled purchases, the Car Shop mechanic and the financial investigation, intended to build a federal case against the individuals discovered to be involved in criminal activity at Car Shop, possibly including Shawn Bryan. (*Id.* at 65:16-18, 73:24 - 74:12.)

On September 18, 2009, Sgt. Buckner, Special Agent Boyden, and other task force members monitored the CI as he[2] made the first controlled purchase of marijuana from Car Shop's mechanic, Gilbert Montoya in Montoya's vehicle.  (*Id.* at 66:21 - 67:17.) Following that successful purchase, Sgt. Buckner, Special Agent Boyden, and the same task force members monitored the CI as he made another controlled purchase of marijuana from Gilbert Montoya, this time inside Car Shop, on the morning of September 21, 2009.  (*Id.* at 70:6-21.)  Once again, the CI was successful, having purchased a quarter pound of marijuana from Montoya. (*Id.* at 71:24 - 72:4.)

Then, the task force members arranged for the CI to conduct another controlled purchase of crack cocaine from Montoya that afternoon, which also was successful.  (*See id.* at 72:2-4, 73:19-21.)  At this point in the investigation, Sgt. Buckner had elected to include additional detectives from the APD Criminal Intelligence Unit, one of whom was Detective Ron Olivas. (*Id.* at 72:6-10.)  For the afternoon controlled purchase, Detective Olivas' assignment was to assist with surveillance.  (*See id.*)  During that surveillance,

---

[2] During his testimony at trial, Sgt. Buckner referred to the CI as "he."  (*See, e.g.,* Trial Tr. 67:21-22.)  Because the Court has no reason to doubt the accuracy of this reference and because the gender of the CI is not material to the resolution of Ahrensfield's Motion, the Court will likewise refer to the CI as "he" when using a pronoun to reference the CI.

Detective Olivas learned that Defendant Brad Ahrensfield's son was working at Car Shop (*id.* at 317:17-20), which was noteworthy to Detective Olivas because he was friends with Ahrensfield (*see id.* at 317:21-23).  However, Detective Olivas and the other task force members were specifically instructed not to tell Ahrensfield about the investigation (*id.* at 318:24-25) because the existence of the investigation and the information acquired through it was considered to be on a "need-to-know basis," (*id.* at 318:7-9.)

Simultaneously with the controlled purchases, Sgt. Buckner began a financial investigation of Shawn Bryan, which comprised determining where Bryan had accounts and whether any of those accounts had been flagged as suspicious.  (*See id.* at 65:22 - 66:20.)  The financial investigation did not progress beyond this initial stage, however, because, according to Sgt. Buckner, the overall investigation was compromised, for reasons later discussed, before Sgt. Buckner could take any additional steps in the financial investigation.  (*Id.* at 66:9-12.)

On September 22, 2009, Special Agent Boyden and Sgt. Buckner held a meeting to devise a plan for a final controlled purchase the following day.  (*Id.* at 73:10-18.)  The basic plan was to use the same CI to make another purchase of crack cocaine from Gilbert Montoya at Car Shop, and after that purchase "to quietly, covertly, later approach and arrest Gilbert Montoya away from the shop, away from anybody else, in an undercover manner, and then talk with him . . . and see . . . if he knew of other criminal activity at the shop, and if so, if he would be willing to work to help [] root out and uncover more criminal activity."  (*Id.* at 73:15 - 74:6.)  Assuming everything went according to plan, the task force intended to use Gilbert Montoya as an informant against Shawn Bryan, whom the task force believed to be Montoya's immediate superior in their small criminal enterprise.  (*Id.* at 74:8-12.)

However, unbeknownst to Special Agent Boyden or Sgt. Buckner at that strategic meeting, the investigation had experienced an unexpected turn of events the previous evening.  During the evening of September 21, 2009, despite the explicit instruction that Ahrensfield not be informed of the investigation, Detective Olivas contacted Ahrensfield to tell him "there was an issue at the Car Shop."  (*Id.* at 319:1-6.)  The two met later that evening, and Detective Olivas told Ahrensfield "there was [an] active investigation underway, that [Detective Olivas] was involved in assisting through Sergeant Buckner, the FBI, with the investigation.  There were possible narcotics being sold at [Car Shop].  There was potentially other crimes being committed or property crimes being done at [Car Shop], and [] that [Ahrensfield's] son was possibly in danger."  (*Id.* at 319:24 - 320:7.)  At the time Detective Olivas shared these details with Ahrensfield, he did not know that Ahrensfield and Shawn Bryan were close friends.  (*Id.* at 320:12-14.)  Detective Olivas, though, did not suggest that Ahrensfield share the details of the investigation with anyone else, and instead helped Ahrensfield to "come up with a solid reason as to why his son could no longer work there to ensure that Mr. Bryan wasn't suspicious or anybody else was suspicious if [Ahrensfield] no longer allowed his son to work [at Car Shop]."  (*Id.* at 320:20-23.)  The two decided that Ahrensfield would tell Bryan that Ahrensfield's son could no longer work at Car Shop because Ahrensfield wanted his son to focus on his schoolwork.  (*Id.* at 321:1-5.)

The following day, Ahrensfield called Shawn Bryan and, as planned, told Bryan that he wanted his son to focus on his schoolwork and did not want him to work at Car Shop anymore.  (*Id.* at 204:19 - 205:3.)  Later that evening though, at approximately 9:00 p.m., Ahrensfield called Bryan, from a number not his own, to arrange a meeting

with Bryan that night.[3]  (*Id.* at 203:21-23, 207:9 - 208:19.)  During that call, Ahrensfield

instructed Bryan to wear a baseball hat and to start walking east along the street in front

of Bryan's house where Ahrensfield would then pick up Bryan.  (*Id.* at 208:18-19.)

Ahrensfield eventually arrived in his girlfriend's car, which was not registered in

Ahrensfield's name, to pick up Bryan. (*Id.* at 209:12-20.)  Once Bryan was inside the car,

Ahrensfield told Bryan that he "needed to listen to what [Ahrensfield] had to say, that

somebody within [Bryan's] organization . . . had done something wrong to the point it

was getting a lot of attention . . .." (*Id.* at 211:25 - 212:4.)  Ahrensfield then told Bryan

that Gilbert Montoya was suspected of dealing drugs out of Car Shop and that "Gilbert

was being worked . . . because [Bryan] was being suspected of running some crime

organization."  (*Id.* at 212:9-10, 217:23-25.)  Additionally, Ahrensfield told Bryan that

Car Shop "was being watched," that Bryan was personally "being looked into," that both

the APD and the FBI were conducting the investigation, and that the investigation

involved a CI.  (*Id.* at 218:1-4, 219:2-8, 220:7-11.)

       Following that conversation with Ahrensfield, Shawn Bryan spoke with each of

his employees, including Gilbert Montoya, to inquire about the allegations of which he

had been informed by Ahrensfield (*id.* at 225:4-8, 256:2-10); the exact nature of those

conversations is unknown.  Bryan also contacted two local police officials with whom he

was familiar, then-Bernalillo County Sheriff Darren White and APD Commander Joe

Hudson, to discuss with them what he had learned from Ahrensfield.  (*See id.* at 243:3-

---

[3] This account of the details of the interaction between Ahrensfield and Bryan
comes from Bryan's testimony at trial.  To the extent Ahrensfield's account of this
interaction differed from Bryan's, that difference is not material to the Court's analysis
of Ahrensfield's Motion given that under the current procedural posture of that Motion
the Court must limit its review to the evidence presented in the United States' case-in-
chief.  The Court, therefore, will not discuss those differences here.

12.)  On the morning of September 23, 2009, Commander Hudson met with Bryan on

two separate occasions (*id.* at 146:12-16, 147:3-4, 156:13-16), and after those meetings

Commander Hudson met with Sgt. Buckner and told him that "[the] investigation is

completely compromised. . . . Shawn Bryan knows everything."  (*Id.* at 77:18-20.)

Consequently, Sgt. Buckner decided to terminate the Car Shop investigation because

"the target of [the] criminal investigation knew everything we were doing, who we were.

There was no reasonable investigative step [the task force] could take at that time.

[Bryan] knew we were looking at him."  (*Id.* at 77:23 - 78:1.)  Nevertheless, the task force

proceeded to arrest Gilbert Montoya on September 23, 2009.  (*Id.* at 78:2-11.)  Special

Agent Boyden and Sgt. Buckner then interviewed Montoya for approximately three

hours, but that interview did not yield any information concerning Shawn Bryan's

alleged involvement in criminal activity.  (*Id.* at 126:10-17.)  The Car Shop investigation

ended after that interview.  (*Id.* at 127:7-14.)

## III.   The Charges Against Ahrensfield

As a result of the aforementioned events, the United States indicted Ahrensfield

for, *inter alia*, obstruction of justice under 18 U.S.C. § 1512 (c)(2).  That section makes it

a crime for anyone to corruptly obstruct, impede, or influence any official proceeding or

to attempt to do so.  To obtain a conviction for a violation of § 1512 (c)(2), the United

States is required to prove each of the following elements beyond a reasonable doubt:

1)   the Defendant acted knowingly, that is, voluntarily and intentionally and
     not by mistake or accident;

2)   the Defendant obstructed, influenced, or impeded or attempted to
     obstruct, influence, or impede an official proceeding;

3)  the Defendant acted corruptly, that is, that the Defendant acted knowingly and dishonestly with the wrongful purpose to obstruct, influence or impede the due administration of justice; and,

4)  the Defendant's alleged actions had a relationship in time, causation, or logic with the proceeding such that it was foreseeable that Defendant's conduct would interfere with the proceeding.  In other words, the Government must prove beyond a reasonable doubt that obstruction of an official proceeding was the natural and probable outcome of Defendant's conduct.

*See* 18 U.S.C. § 1512 (c)(2); *United States v. Philips*, 583 F.3d 1261, 1263-64 (10th Cir. 2009); Tenth Circuit Pattern Jury Instruction 1.37 (defining "knowingly"); *see also Arthur Anderson, LLP v. United States*, 544 U.S. 696, 705 (2005).

For purposes of  § 1512 (c)(2), an "official proceeding" means a proceeding before a judge or court of the United States or a federal grand jury. 18 U.S.C. § 1515 (a)(1)(A). Importantly, "§ 1512(c)(2) does not require that the defendant know of the existence of an ongoing official proceeding," *Philips*, 583 F.3d at 1264, nor does it require that an official proceeding actually "be pending or about to be instituted at the time of the offense."  18 U.S.C. § 1512 (f)(1).  "Rather, a conviction under the statute is proper if it is foreseeable that the defendant's conduct will interfere with an official proceeding." *Philips*, 583 F.3d at 1264 (citing 18 U.S.C. § 1512 (f)(1)).  Additionally, "§ 1512(g)(1) makes clear that the government need not prove the defendant knew that the official proceeding at issue was a federal proceeding such as a grand jury investigation."  *Id.* at 1264-65.  Stated otherwise, the United States must prove that the defendant intended to

obstruct, influence or impede "a proceeding that was in fact federal, not that the defendant knew the proceeding was federal in nature." *See United States v. Ramirez Umana*, 2010 WL 1141366, at * 5 (W.D.N.C. Mar. 18, 2010)(unpublished).  However, the official proceeding "must be at least foreseeable to the defendant, because a defendant who 'lacks knowledge that his actions are likely to affect [a] judicial proceeding . . . lacks the requisite intent to obstruct.'"  *Philips*, 583 F.3d at 1264 (quoting *Arthur Anderson, LLP v. United States*, 544 U.S. 696, 708 (2005))(alterations in original).  "Accordingly, . . . a defendant's obstructive conduct [must] have a nexus in time, causation, or logic with the proceeding the defendant is charged with obstructing. . . . In this way, . . . the nexus limitation is best understood as an articulation of the proof of wrongful intent that will satisfy the *mens rea* requirement of 'corruptly' obstructing."  *Phillips*, 583 F.3d at 1263-64 (internal citations, quotation marks, and alterations omitted).

## IV.   Ahrensfield's Motion for Judgment of Acquittal

Ahrensfield moves for a judgment of acquittal on the § 1512 (c)(2) obstruction of justice charge on two grounds.  First, he asserts that the United States presented insufficient evidence in its case-in-chief to establish each of the elements required for a conviction.  Second, Ahrensfield argues that regardless of the sufficiency of the evidence, convicting Ahrensfield of obstruction of justice under these circumstances would violate his right to free speech under the First Amendment.  The Court will address each argument independently.

### A.   Sufficiency of the Evidence

Although this case presents somewhat of a close call, the Court finds that in viewing the evidence in the light most favorable to the United States, the evidence

adduced during the United States' case-in-chief is sufficient to establish beyond a reasonable doubt each element of the obstruction of justice charge.

Initially, the Court notes that Ahrensfield does not appear to dispute that the United States presented sufficient evidence to support the first element — that Ahrensfield acted knowingly in making his statements to Shawn Bryan. However, to the extent Ahrensfield does contest the sufficiency of the evidence supporting that element, the Court finds that Shawn Bryan's testimony that Ahrensfield contacted Bryan, arranged a meeting between the two, and directly told Bryan various details of the Car Shop investigation without prompting would lead any reasonable jury to conclude that Ahrensfield acted knowingly, and not by mistake or accident, in disclosing those details.

Ahrensfield does, however, ostensibly challenge the sufficiency of the evidence supporting the second element of the offense — that Ahrensfield obstructed, influenced, or impeded or attempted to obstruct, influence, or impede an official proceeding. In this vein, Ahrensfield contends that the evidence at trial showed that "[t]he APD and FBI went ahead with their plan, and simply failed to make a case, not because of anything Mr. Ahrensfield did, but rather, because Mr. Montoya wouldn't implicate Shawn Bryan." (Mot. at 11.) Furthermore, Ahrensfield seemingly maintains that it would have been impossible for him to obstruct an official proceeding because

> no grand jury would ever be convened because the ultimate goal of the investigation, having Montoya 'roll' on Bryan never came to fruition. Even had this come to fruition, no evidence has been presented that th[e] [Car Shop] case would ever meet the federal threshold, which is required by law. No federal grand jury was going to be convened in this case because the FBI had no evidence of Mr. Bryan being involved in criminal activity.

(*Id.* at 12.)

12

The United States responds by arguing that Ahrensfield's "leak made it impossible for the controlled purchase of ¼ ounce of crack cocaine to take place on the morning of September 23.  That investigation clearly was thwarted.  And had the plan gone forward, Montoya would have been facing a mandatory minimum sentence of five years imprisonment under 21 U.S.C. §§ 841 (a)(1) and (b)(1)(B).  He would have had substantial motivation to work as a confidential informant against Bryan.  Of course, [Ahrensfield]'s leak made any covert investigation impossible."  (Resp. at 5.)  The United States adds that "[i]n any case, whether [Ahrensfield] actually obstructed justice is irrelevant.  [Ahrensfield] clearly intended to protect his close friend by obstructing the investigation."  (*Id.* at 6.)

The United States is correct that the focus of the inquiry with respect to this element is not whether the evidence supports a finding that Ahrensfield actually obstructed an official proceeding but rather whether the evidence demonstrates that Ahrensfield *intended* to obstruct such a proceeding.  *United States v. Aguilar*, 515 U.S. 593, 599 (1995)(holding that "the defendant's actions need [not] be successful; an endeavor suffices.")(internal citation and quotation marks omitted); *accord Phillips*, 583 F.3d at 1263-64.  Based on the evidence presented in the United States' case-in-chief, the Court finds that a jury could reasonably conclude that Ahrensfield intended to obstruct an official proceeding.  Notably, the jury heard that Ahrensfield directly told Shawn Bryan about the existence of the investigation into both Bryan and his business, the FBI's and APD's involvement in the investigation, and the investigative techniques employed, including the use and anticipated use of informants.  Furthermore, according to Bryan's testimony, Ahrensfield identified the anticipated informant when he told

13

Bryan that the task force was "working" Gilbert Montoya in an effort to uncover evidence of Bryan's alleged role in a criminal enterprise. Viewed in the light most favorable to the United States, a jury could reasonably take from that evidence that Ahrensfield disclosed those details to Bryan to thwart any chance that Bryan would engage in illegal activity under the watch of the task force or in the presence of Gilbert Montoya, a known, potential informant. Likewise, that evidence would also support the conclusion that Ahrensfield disclosed those details to alert Bryan of the need to minimize the appearance of his involvement in any criminal activity and to confer with anyone in his business engaged in such activity of the need to do the same. While Ahrensfield seemingly contends that this characterization of the evidence only suggests, at most, Ahrensfield's intent to impede only the law enforcement investigation, the Court does not agree. That evidence sufficiently supports the conclusion that Ahrensfield disclosed those details with the intent of curtailing any type of official proceeding from arising out of the nascent investigation, and thus is sufficient, for purposes of this analysis, to establish the second element.

The discussion now turns to the primary focus of the parties' arguments, the third and fourth elements — that Ahrensfield acted corruptly and that his actions were sufficiently close in time, causation, or logic with an official proceeding.[4] Ahrensfield contends that the United States' evidence does not support the nexus element because

---

[4] Although the parties articulated these elements separately in their respective definitions of the offense, both parties combined their arguments regarding these elements, which is not surprising given that the Tenth Circuit has recognized that the nexus element is really just a more expansive articulation of the "corruptly" *mens rea* element, *Phillips*, 583 F.3d at 1263-64. The Court will therefore address the parties' arguments in accordance with their presentation in the briefing and the Tenth Circuit's understanding of those elements.

"there is no way that the following plan satisfies the nexus requirement: 1) let a known burglar out of jail and make him a CI, 2) attempt to have that CI make controlled buys to a low-level mechanic at a business, 3) arrest that low-level mechanic, 4) hope that the low-level mechanic 'rolls' on the owner of the business, and 5) hope that as a result of the mechanic 'rolling' on the owner that a federal grand jury would convene to investigate the actions of that owner when it was not even known if those 'hunches' of criminal activity would meet the federal threshold." (Mot. at 12.) Additionally, Ahrensfield maintains that "[a] federal grand jury investigation was never pending and there is no evidence any such official proceeding was contemplated by [Ahrensfield] especially where the most evidence the task force had was low-level drug buys." (*Id.*)

Ahrensfield relies heavily on *Aguilar*, 515 U.S. 593 (1995), to support his argument that the United States failed to demonstrate a nexus between Ahrensfield's conduct and obstruction of an official proceeding. In *Aguilar*, a jury convicted United States District Judge Robert Aguilar of, *inter alia*, "corruptly endeavor[ing] to influence, obstruct, and impede [a] . . . grand jury investigation" in violation of 18 U.S.C. § 1503 for false statements he made to FBI agents during their investigation of the unauthorized disclosure of a wiretap. Ultimately, the United States Supreme Court reversed Judge Aguilar's conviction finding that the government had demonstrated only that Judge Aguilar "utter[ed] false statements to an investigating agent . . . who might or might not testify before a grand jury . . .." *Aguilar*, 515 U.S. at 600. The Court held that such evidence was insufficient to establish the required nexus between Judge Aguilar's conduct and obstruction of the grand jury proceeding because the government had not demonstrated that Judge Aguilar knew his false statements were likely to obstruct a

15

grand jury investigation and "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct." *Id.* at 599.

According to Ahrensfield, his actions in this case "do not even rise to the level of the actions by Judge Aguilar." (Mot. at 12.) Ahrensfield notes that in *Aguilar*, a federal grand jury eventually convened and was in fact ongoing when Judge Aguilar provided false statements to the FBI agents.  In contrast, Ahrensfield contends that " [i]n this case, no grand jury would ever be convened because the ultimate goal of the investigation, having Montoya 'roll' on Bryan never came to fruition. Even had this come to fruition, no evidence has been presented that this case would ever meet the federal threshold, which is required by law. No federal grand jury was going to be convened in this case because the FBI had no evidence of Mr. Bryan being involved in criminal activity." (*Id.*)  Ahrensfield adds that "[a]t most, the government showed at trial that Mr. Ahrensfield knew about a joint investigation. However, there was no evidence or testimony from anyone that Mr. Ahrensfield knew or contemplated any type of official proceeding or grand jury, and endeavored to obstruct such." (*Id.* at 12-13.)

Additionally, Ahrensfield points to *Arthur Andersen*, 544 U.S. 696 (2005), to bolster his argument that the United States failed to present sufficient evidence to establish the nexus element.  In *Arthur Andersen*, the United States Supreme Court reversed the conviction of Arthur Andersen, LLP, Enron's auditor, for allegedly violating 18 U.S.C. §§ 1512 (b)(2)(A) and (B),[5] finding that the district court's jury instructions

---

[5] Those sections make it a crime to "knowingly . . . corruptly persuad[e] another person with intent to ... cause that person to withhold documents from, or alter documents for use in, an official proceeding."  *Arthur Andersen*, 544 U.S. at 703 (internal quotation marks omitted, alterations in original).

failed to apprise the jury of the "necessary consciousness of wrongdoing" needed to constitute a violation of that statute. *Id.*, 544 U.S. at 706. Indeed, the Court found that the jury instructions were "infirm [because] . . . [t]hey led the jury to believe that it did not have to find *any* nexus between the persuasion to destroy documents and any particular proceeding." *Id.* at 707. While the Court recognized the language of § 1512 (e)(1), which provides that an official proceeding need not be pending or about to be instituted at the time of the offense, the Court observed that "[i]t is . . . one thing to say that a proceeding need not be pending or about to be instituted at the time of the offense, and quite another to say a proceeding need not even be foreseen." *Id.* at 707-08. Thus, the Court found that "[a] knowingly . . . corrup[t] persaude[r] cannot be someone who persuades others to shred documents under a document retention policy when he does not have in contemplation any particular official proceeding in which those documents might be material." *Id.* at 708 (ellipsis, second, and third alterations in original).

Ahrensfield places particular emphasis on that latter language. Specifically, he argues that:

> here, the government did not prove that Mr. Ahrensfield had in contemplation a particular official proceeding at the time he made his statements to Shawn Bryan. Thus, if the proof had been that a grand jury investigation was underway and that Mr. Ahrensfield had known of the grand jury regarding Shawn Bryan or his finances, and that Ahrensfield had warned him to move money or hide financial information, that would certainly have fit more within the Supreme Court case interpretations of [§] 1512. That was not the proof adduced at trial, however. Reading the statute to criminalize the statements before this Court, however, would result in an extreme overbroad application of [§] 1512.

(Reply at 6-7.)

The United States responds by arguing generally that "[t]he trial evidence clearly showed that Ahrensfield intended to obstruct justice." (Resp. at 5.) In that vein, the United States observes that:

> Bryan testified that [Ahrensfield] called on September 22. [Ahrensfield] explained that his son had to quit his part time job at Car Shop because of school commitments. This explanation was effective without raising any suspicion. In fact, Bryan testified he told [Ahrensfield] "okay, great." Yet, later that evening, [Ahrensfield] purposely revealed every detail of the investigation to Bryan. The clandestine manner in which [Ahrensfield] leaked the investigation to Bryan amounts to more than sufficient evidence that [Ahrensfield] acted knowingly and corruptly.

(*Id.*)(citations omitted). Additionally, the United States maintains that Ahrensfield's status as a law enforcement officer when he disclosed details of the Car Shop investigation to Shawn Bryan supports a finding that a grand jury proceeding was foreseeable to Ahrensfield because "[a]s an experienced police officer, [Ahrensfield] could reasonably foresee that a grand jury investigation would follow [the Car Shop investigation] because it is a 'necessary part' of such investigations." (Resp. at 6) (quoting *Phillips*, 583 F.3d at 1265).

The United States looks primarily to *Phillips* to support its arguments that the evidence concerning Ahrensfield's conduct is sufficient to establish each of the elements of § 1512 (c)(2). In *Phillips*, the Tenth Circuit affirmed the conviction of Defendant Phillips for violating § 1512 (c)(2) by disclosing the identity of an undercover police officer to the target of ongoing controlled narcotics purchases. *Id.*, 583 F.3d at 1265. Phillips argued that the trial evidence only demonstrated that he knew the undercover officer was a policeman, not that he knew about any future or ongoing federal grand jury investigations, and thus contended that he lacked the requisite mens rea to be convicted

under § 1512 (c)(2).  In rejecting that argument, the Tenth Circuit held that from the evidence presented at trial, "a jury could find that Mr. Phillips had no purpose other than to thwart [a grand jury investigation of the target's drug distribution and her supply source.]" *Id.* at 1265.  Specifically, the court noted the evidence tending to show that Phillips knew that the officer was acting in an undercover capacity and had been or would be attempting to make controlled purchases from the target, and that Phillips had bragged about "burning" the undercover officer, *i.e.* outing his undercover status.  With respect to the latter evidence, the court found that it "beg[ged] the inference that [Phillips] actually intended to obstruct the investigation into the methamphetamine trade in Dodge City — of which the federal grand jury proceedings were a necessary part." *Id.*  Thus, the court found all of that evidence viewed in the light most favorable to the government was sufficient to warrant a jury finding Phillips guilty beyond a reasonable doubt of obstructing a federal grand jury investigation.

According to the United States, "[t]he evidence against [Ahrensfield] is very similar to that in *Phillips*."  (Resp. at 6.)  In particular, the United States notes that similar to Phillips disclosing the undercover officer's identity to the target of the controlled purchases, the evidence here showed that Ahrensfield "leaked the details of the entire investigation, including the use of the confidential informant, to Bryan."  (*Id.*)  Furthermore, the United States invokes the Tenth Circuit's language from *Phillips*, arguing that Ahrensfield's knowledge of the existence of the investigation, the controlled purchases, and the financial investigation of Shawn Bryan, all made a federal grand jury reasonably foreseeable to Ahrensfield because such proceedings are a "necessary part" of investigations like the one here.  (*Id.* at 7)(quoting *Phillips*, 583 F.3d at 1265).

19

Although Ahrensfield contends that his conduct in this case is far removed from the defendant's conduct in *Phillips*, and is more akin to the conduct at issue in *Aguilar*, the Court does not agree.  Like the defendant in *Phillips*, the evidence here tends to show that Ahrensfield revealed to Shawn Bryan, the target of the joint task force investigation, that an investigation was ongoing, that a CI was involved, and that another individual, Gilbert Montoya, either was being or would be used as an informant against Bryan.  Conversely, in *Aguilar*, the conduct for which Judge Aguilar was prosecuted under § 1503, and with which Ahrensfield attempts to equate his own, was at least two steps removed from the underlying investigation.  Judge Aguilar did not directly disclose the existence of the wiretap to the subject of that wiretap nor did he provide false statements directly to the grand jury or agents acting on the grand jury's behalf.  Instead, Judge Aguilar provided false statements to FBI agents conducting an independent investigation whose likelihood of testifying before a grand jury was uncertain.  Ahrensfield's comparison of his conduct to that of Judge Aguilar's is therefore not apt.  Unlike the situation involving Judge Aguilar, the evidence against Ahrensfield showed that his disclosures were to the very person who was under investigation and who was, to a certain extent, associated with completed sales of marijuana and crack cocaine.  A jury could thus reasonably infer a more direct impact on the investigation and eventual judicial proceedings from Ahrensfield's conduct.

However, the governing case law makes clear that those potentially impactful disclosures alone are not sufficient to sustain a conviction under § 1512 (c)(2) unless they were made for a corrupt purpose and had a sufficient nexus to a foreseeable official proceeding.  *See Phillips*, 583 F.3d at 1263-64. With respect to the "corruptly" element, it is indeed rare that an individual will convey his intent directly in these circumstances.

20

Hence, the jury must infer the individual's intent from the statements themselves, the individual's conduct while making the statements, and the circumstances under which the individual makes the statements.  In other words, the essential inquiry is whether the jury could reasonably infer from the statements and the circumstances presented that the defendant's purpose in making those statements was corrupt.  Viewing the evidence in the light most favorable to the United States, the Court finds that a jury could reasonably infer a corrupt purpose by Ahrensfield from the evidence presented.

Notably, viewing the testimony of Bryan and Detective Olivas in combination, a jury could logically conclude that the nighttime meeting between Ahrensfield and Bryan was unnecessary given that Ahrensfield had provided and Bryan had accepted the excuse Ahrensfield and Detective Olivas had devised to extricate Ahrensfield's son from Car Shop.  Furthermore, a jury could reasonably infer a desire to avoid detection at that nighttime meeting based on Bryan's testimony about Ahrensfield calling from a phone number not his own, picking up Bryan in a car that was not registered to Ahrensfield, and instructing Bryan to walk along a street to be picked up rather than picking up Bryan at his house.  Moreover, the content of Ahrensfield's statements to Bryan also suggest a corrupt purpose when drawing inferences from those statements in the light most favorable to the government.  Specifically, a jury could reasonably infer from Ahrensfield's disclosure of the investigation of Car Shop and Bryan personally, the use of a CI, and Gilbert Montoya's status as a potential informant, that Ahrensfield wrongfully intended to assist Bryan in evading eventual prosecution, in which a grand jury would necessarily be involved, and alert Bryan of the need to take protective measures, *e.g.* by destroying evidence, devising explanations for any suspicious activity, or telling others

to do the same, if in fact he was engaged in criminal activity or overseeing others engaged in such activity.

Although Ahrensfield argues that he could not be found to have a corrupt purpose because the United States did not present any evidence that he had a particular proceeding in mind when he spoke with Bryan, that argument misses the mark.  Under Ahrensfield's construction of the law, the United States would be required to prove that Ahrensfield specifically had in mind a federal grand jury investigation when he disclosed details of the Car Shop investigation to Bryan.  That formulation, however, runs afoul of the express language of § 1512 (g)(1), which provides that the United States need not prove any state of mind with respect to the federal nature of the proceeding.  Furthermore, Ahrensfield's articulation of the law would allow a corrupt obstructor who intends to obstruct justice generally to escape criminal liability simply by claiming that he took his actions without regard to any specific proceeding.  The Court does not believe that the United States Supreme Court, in using the "particular proceeding" language, intended the formulation of the law that Ahrensfield suggests — one that, if adopted, would produce untoward results and render almost meaningless § 1512 (c)(2) and its counterparts.  Instead, when viewed in context, the "particular proceeding" language appears to be no more than an alternate articulation of the foreseeability element.  *See Arthur Andersen*, 544 U.S. at 707-08.  In other words, the "particular proceeding" language appears intended to clarify the government's burden of demonstrating that, at the time of the defendant's conduct, some type of official proceeding was foreseeable, not merely a remote possibility at some far off date.

With that evidence tending to show a corrupt purpose, the question then becomes whether an official proceeding would have been foreseeable to Ahrensfield at the time he disclosed details of the investigation to Bryan.  While the United States urges the Court to apply a subjective inquiry into whether Ahrensfield could have reasonably foreseen a federal grand jury investigation in this case based on his law enforcement background, the Court declines to do so given the paucity of evidence presented in the United States' case-in-chief concerning that background.  Indeed, the jury only heard passing references to Ahrensfield's former positions as a SWAT officer with the APD and as an instructor at the APD Academy (Trial Tr. 56:8-11, 311:18-21), but none of the witnesses in the United States' case-in-chief expanded on those references to provide the jury with any information concerning the kind of knowledge, particularly of the judicial system, an officer would acquire in those positions.  Thus, to find that the jury could infer specialized knowledge from those references would be to allow the jury to engage in a degree of speculation that far exceeds the permissible bounds of its fact finding function, which, of course, the Court will not allow.

Nevertheless, the Court finds that the other evidence presented in the United States' case-in-chief was sufficient to establish that an official proceeding would have been foreseeable to Ahrensfield at the time of his meeting with Bryan.  At the time Ahrensfield held the nighttime meeting with Bryan, the evidence suggests that Ahrensfield knew the following: 1) the task force was investigating Car Shop and Shawn Bryan personally, 2) the task force had successfully completed controlled purchases of narcotics from an individual at Car Shop, 3) the task force was using a CI in its investigation, 4) the task force intended to use Gilbert Montoya as an informant against

23

Shawn Bryan, and 5) someone was "going down" sometime soon after Ahrensfield spoke with Shawn Bryan (Trial Tr. at 212:14-18).  In other words, Ahrensfield knew that the investigation of Car Shop and Shawn Bryan was active, not just in its planning stages, and that the investigation had uncovered evidence of criminal activity ongoing at Car Shop.  Furthermore, that evidence tends to show that Ahrensfield was aware that the task force intended to build a larger case, likely against Shawn Bryan, through the use of Gilbert Montoya as an informant.  Moreover, Ahrensfield's knowledge that someone was "going down soon" suggests that Ahrensfield knew the task force intended to take some type of overt action that would logically lead to a judicial proceeding.  Viewed as a whole, that evidence tends to show that Ahrensfield was aware that the investigation had progressed beyond an exploratory phase and had reached a point where overt action was imminent, making the likelihood of an official proceeding, and particularly a grand jury proceeding, a virtual certainty and not a remote or inconceivable possibility as Ahrensfield suggests.

Ahrensfield ostensibly disputes the foreseeability of a federal grand jury investigation by arguing that such an investigation would never have commenced, or if it did would have proved unsuccessful, given the purported lack of evidence against Bryan. This argument, however, reflects both a misunderstanding of the function of a federal grand jury and of the law applicable to this case.  It is well-recognized that "[a] federal grand jury has broad inquisitorial powers."  *United States v. Erickson*, 561 F.3d 1150, 1161 (10th Cir. 2009).  As the United States Supreme Court has explained,

> The grand jury occupies a unique role in our criminal justice system. It is an investigatory body charged with the responsibility of determining whether or not a crime has been committed. Unlike this Court, whose

> jurisdiction is predicated on a specific case or controversy, the grand jury
> can investigate merely on suspicion that the law is being violated, or even
> just because it wants assurance that it is not. The function of the grand
> jury is to inquire into all information that might possibly bear on its
> investigation until it has identified an offense or has satisfied itself that
> none has occurred. As a necessary consequence of its investigatory
> function, the grand jury paints with a broad brush. A grand jury
> investigation is not fully carried out until every available clue has been run
> down and all witnesses examined in every proper way to find if a crime has
> been committed.

*United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991)(internal citations and

quotation marks omitted).  Furthermore, and particularly important to this case, "the

identity of the offender, and the precise nature of the offense, if there be one, normally

are developed at the conclusion of the grand jury's labors, not at the beginning." *Id.*

(quoting *Blair v. United States*, 250 U.S. 273, 282 (1919)).  Hence, presentation of

evidence to a federal grand jury is not necessarily an end in itself, but is often a means to

an end.  Thus, in this case, that the task force had not developed a case against Bryan

ready for prosecution at the time Ahrensfield disclosed details of the investigation is

immaterial to whether a federal grand jury would have commenced.

Moreover, Ahrensfield's arguments concerning the likely success of a federal

grand jury proceeding against Bryan is equally unavailing.  Once again, Ahrensfield's

argument in this regard interjects a point that is not relevant to the Court's or the jury's

inquiry.  The foreseeability element relates to the commencement of the proceeding

itself, not to the eventual result of that proceeding.  *Cf. Phillips*, 583 F.3d at 1263-64.  As

such, the sufficiency of the evidence against Bryan is not determinative of the

foreseeability of an official proceeding arising from the investigation of him and his

business.  Regardless of the strength of the evidence against Bryan, a jury could

reasonably conclude, based on the evidence discussed above, that Ahrensfield's disclosure of details of the investigation to Bryan prevented an official proceeding, and particularly a grand jury proceeding, from ever commencing given the highly detrimental impact that disclosure had on the underlying investigation and that this result would have been foreseeable to Ahrensfield at the time he made that disclosure.

Thus, viewing the evidence as a whole and in the light most favorable to the United States, the Court finds that a jury could reasonably find Ahrensfield guilty beyond a reasonable doubt of violating § 1512 (c)(2).

### B.   Whether a Conviction Under § 1512 (c)(2) Would Violate Ahrensfield's First Amendment Rights

Aside from challenging the sufficiency of the evidence supporting the obstruction of justice charge, Ahrensfield also challenges the constitutionality of § 1512 (c)(2).  In particular, Ahrensfield contends that prosecuting him under § 1512 (c)(2) would violate his First Amendment right to free speech because he "was acting as a citizen rather than a public employee when making the alleged speech in this case."  (Mot. at 13.) Nevertheless, he maintains that even if he was acting as a public employee at the time, "he is still entitled to protection because drug dealings out of the Car Shop are a public concern."  (*Id.*)  Ahrensfield acknowledges that the First Amendment does not protect speech directed at inciting imminently lawless activity or speech that is likely to do so, *see Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969), and asserts that his speech in this case did not "encourage anyone to break any laws," and is therefore entitled to First Amendment protection.  (Mot. at 14.)

The United States responds by arguing that Ahrensfield's speech in this case is not entitled to First Amendment protection because that speech resulted in the disclosure of details of a confidential investigation, which "possibly could have endangered a confidential informant and law enforcement officers." (Resp. at 8.) According to the United States, Ahrensfield's claim of First Amendment protection for his speech in this case would render "the federal laws that prohibit *inter alia* the making of threats, tampering with witnesses, and offering bribes . . . unenforceable." (*Id.*) Furthermore, the United States contends that Ahrensfield's ostensible assertion of absolute protection for speech not aimed at inciting criminal behavior is contrary to law, noting the United States Supreme Court's recognition in *Dennis v. United States*, 341 U.S. 494, 508 (1951), that "[s]peech is not an absolute, above and beyond control by the legislature when its judgment . . . is that certain kinds of speech are so undesirable as to warrant criminal sanction."

To be sure, the First Amendment protects a broad array of speech, but that broad protection has never been read to protect all but speech aimed at inciting criminal behavior. *See United States v. Rosen*, 445 F. Supp. 2d 602, 629-30 (E.D.Va. 2006) (collecting cases). To the contrary, and as the United States points out, it is well-settled that certain other types of speech are not protected by the First Amendment, *see, e.g., Roth v. United States*, 354 U.S. 476 (1957) (holding that obscene speech violating fundamental notions of decency is not protected by the First Amendment), and that certain kinds of restrictions on otherwise protected speech may be appropriate, *see, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (noting that "even in a public forum the government may impose reasonable restrictions on the time, place, or

27

manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.")(citation and internal quotation marks omitted). These exceptions to the broad free speech rights afforded by the First Amendment reflect the idea that "the societal value of speech must, on occasion, be subordinated to other values and considerations." *Dennis*, 341 U.S. at 503.

Although Ahrensfield apparently argues that the societal value of his speech in this case was great because he was purportedly alerting the public to potential drug dealing at Car Shop, the Court has no trouble concluding that the value of that speech, whatever it may be, must be subordinated to Congress' overwhelming interest in preserving the integrity and viability of official proceedings in the federal courts.  And, contrary to Ahrensfield's assertion, Congress has not, through § 1512 (c)(2), sought to further that compelling interest in an overly broad fashion.  While Ahrensfield contends that potentially innocent speech could be subject to prosecution under § 1512 (c)(2), that simply is not the case.  The express language of § 1512 (c)(2) and the case law interpreting it makes clear that only corrupt, intentional conduct linked by time, causation, or logic to a foreseeable official proceeding is punishable.  *See Phillips*, 583 F.3d at 1263-65.  In other words, neither accidental conduct that inadvertently obstructs an official proceeding nor intentional conduct for some legitimate purpose, *e.g.* provision of legal advice, *see* 18 U.S.C. § 1515 (c), falls within the scope of § 1512 (c)(2). Hence, § 1512 (c)(2) is narrowly circumscribed to punish only a select category of criminal conduct and does not extend beyond its permissible constitutional limitations.

28

As discussed above, the evidence presented in the United States' case-in-chief tends to show that Ahrensfield's speech in this case, *i.e.* his disclosure of details of the Car Shop investigation to Shawn Bryan, was of the type appropriately punishable by § 1512 (c)(2) because the evidence suggests Ahrensfield engaged in that speech for the corrupt purpose of obstructing a foreseeable official proceeding.  Thus, because § 1512 (c)(2) is not overly broad and because Ahrensfield's speech in this case falls squarely within the constitutional ambit of that statute, the Court finds that prosecuting Ahrensfield under § 1512 (c)(2) does not violate his rights under the First Amendment.

## CONCLUSION

The evidence presented in the United States' case-in-chief was sufficient to establish each of the elements of the obstruction of justice charge under § 1512 (c)(2).  Additionally, § 1512 (c)(2) is not overly broad and prosecuting Ahrensfield under that statute does not violate his First Amendment rights.  Accordingly,

**IT IS ORDERED THAT** Defendant Brad Ahrensfield's Motion for Judgment of Acquittal on the Charge of Obstruction of Justice Under Fed. R. Crim. P. 29 (Doc. No. 45) and Defendant Brad Ahrensfield's Motion for Judgment of Acquittal on the Charge of Obstruction of Justice Under Fed. R. Crim. P. 29 (Doc. No. 71) are DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE