**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                    No.    09-CR-3457

BRAD AHRENSFIELD,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

On December 15, 2010, in the midst of a retrial of a criminal charge by a jury, Defendant Brad Ahrensfield filed a Motion to Dismiss With Prejudice Based on Brady Violation (Motion to Dismiss) (Doc. No. 121). Due to the Court's need to hold an evidentiary hearing on the Motion to Dismiss, the Court took the Motion to Dismiss under advisement and continued the trial. On December 16, 2010, the jury returned a guilty verdict. As a result of Ahrensfield's subsequent filing of a number of supplemental briefs and exhibits, the Court required Ahrensfield to file a single consolidated motion that addressed all of the alleged *Brady* violations. On March 11, 2011 Ahrensfield filed his Consolidated Motion to Dismiss for Brady/Giglio Violations (*Brady* Motion) (Doc. No. 163). The Government filed its Response (Doc. No. 166) on March 23, 2011 and Ahrensfield filed his Reply (Doc. No. 168) on April 6, 2011. Having considered the arguments of both parties as well as the applicable law, the Court concludes that Ahrensfield's *Brady* Motion should be denied. Ahrensfield's Motion to Dismiss will also be denied as it was mooted by Ahrensfield's filing of his *Brady* Motion.

**BACKGROUND**

In September 2009, the Albuquerque Police Department received a tip from a

confidential informant that a criminal enterprise was operating out of Car Shop, a business in Albuquerque, New Mexico.  The informant reported that Gilbert Montoya, a mechanic at Car Shop, was selling narcotics.  The informant also alleged that three employees of Car Shop, including Shawn Bryan, the owner of Car Shop, had purchased stolen property from the informant in the past.  The informant contended that Shawn Bryan "ran the show" and that nothing took place at Car Shop without Bryan's permission.  Trial 2 Tr. at 33.[1]  As a result of this information, a task force that included members of the Albuquerque Police Department (APD) and the Federal Bureau of Investigation (FBI) began an undercover investigation of Car Shop and Shawn Bryan.

As part of this investigation, the task force used the confidential informant to make a number of controlled drug purchases from Gilbert Montoya.  The task force intended to arrest Montoya after making a series of drug purchases and then attempt to "roll" Montoya to get information about Shawn Bryan's alleged criminal activity.  During the first controlled purchase, the informant and Montoya met at a location some distance from Car Shop and the informant purchased a quarter-pound of marijuana from Montoya.  During the second controlled purchase, the informant met Montoya at Car Shop and again purchased a quarter-pound of marijuana. Trial 2 Tr. at 39.  During the third controlled purchase, the informant and Montoya met about a block away from Car Shop and the informant purchased twenty bundles of crack cocaine.  Trial 2 Tr. at 43.  The task force planned to make a fourth and final controlled purchase that never occurred due to the events that lead up to Ahrensfield's arrest and prosecution.

In addition to making the controlled drug purchases, the task force also set up

---

[1]The transcripts of the first trial (Doc. Nos. 64-69) will be cited as Trial 1 Tr. The transcripts of the second trial (Doc. Nos. 147, 151, 154, and 155) will be cited as Trial 2 Tr.

surveillance on Car Shop to investigate the allegations that stolen property was being sold and stored at Car Shop. During this surveillance, the officers noticed that Zach Ahrensfield, Brad Ahrensfield's high school age son, was working at Car Shop. Because Brad Ahrensfield was an APD officer, one of the investigating officers, Ron Olivas, thought that Ahrensfield should be informed about the ongoing investigation. Despite being instructed not to inform Ahrensfield about the investigation, Olivas told Ahrensfield about the investigation and helped Ahrensfield devise a story to tell Shawn Bryan that would allow Ahrensfield to get his son to stop working without alerting Bryan to the investigation. At the time that Olivas informed Ahrensfield about the investigation, Olivas was unaware that Ahrensfield and Bryan were close friends.

On September 22, 2010, Ahrensfield called Bryan to advise him that Zach Ahrensfield could no longer work at Car Shop. In accordance with the plan that Brad Ahrensfield had devised with Olivas, Ahrensfield told Bryan that his son could not work at Car Shop any more because he needed to focus on his school responsibilities. Later that night, Ahrensfield called Bryan a second time. This time, however, Ahrensfield called Bryan from a payphone. Ahrensfield asked Bryan to meet on the street outside of Bryan's gated community and advised Bryan to wear a hat. Rather than driving his own truck to pick up Bryan, Ahrensfield drove his girlfriend's Jeep.[2] When Bryan got into the Jeep, Ahrensfield proceeded to tell Bryan about the undercover investigation. Ahrensfield informed Bryan that APD and the FBI were conducting an undercover operation at Car Shop, that Bryan was suspected of being the "sergeant major," or

---

[2]Ahrensfield testified that he called from a payphone because he had accidentally left his cell-phone at home, that he asked Bryan to meet in the street because he did not want to have to go through the gate to the community, that he asked Bryan to put on a hat because it was cold out, and that he drove his girlfriend's Jeep because she had been asking him to drive it to check on a mechanical issue.

leader, of a crime organization, and that Bryan's mechanic was dealing drugs. Later that night, after hearing this information, Bryan contacted Darren White, who was then the Bernalillo County Sheriff, to inquire about why he was under investigation.

The next morning, September 23, 2009, Bryan met with Joe Hudson, who was at that time the Commander of the Albuquerque Police Department, and asked Hudson about the undercover investigation.  It became apparent to Hudson from his conversation with Bryan that Bryan was aware of a number of details of the investigation, and Bryan informed Hudson that he had learned about the investigation from Ahrensfield.  Later that morning, Hudson and Bryan met with Robert Smith, who was at that time a Lieutenant with the Albuquerque Police Department, and Bryan again disclosed a number of details about the covert operation. Because of Bryan's awareness of the ongoing investigation, the investigation was shut down. Despite having to shut down the investigation, the task force was still able to arrest and interrogate Gilbert Montoya.  However, the confidential informant was not able to make a final drug buy due to the fact that the investigation had been compromised.  Gilbert Montoya did not provide any information that implicated Shawn Bryan in any criminal activity.

Because Ahrensfield had disclosed the existence of the investigation to Bryan, and Ahrensfield had therefore compromised the investigation, Ahrensfield was arrested and charged with one count of obstruction of justice.  Ahrensfield was also charged with one count of allegedly making false statements to the FBI agents who investigated Ahrensfield's disclosure of the undercover operation. The case first went to trial in April 2010.  At the conclusion of that trial, the jury found Ahrensfield not guilty of making false statements but was unable to reach a verdict on the obstruction of justice charge. *See* Verdict (Doc. No. 57).  As a result, trial was reset on December 13, 2010 on the remaining obstruction of justice charge.

4

During the direct examination of Shawn Bryan at the second trial, the Government impeached Bryan's testimony by reading from a transcript of an interview that the FBI had conducted with Bryan after Ahrensfield's first trial.  Ahrensfield's counsel advised the Court that Ahrensfield had never been provided with a copy of the transcript or a recording of the interview and that Ahrensfield and his counsel were unaware that the FBI had interviewed Bryan following the first trial.  Trial 2 Tr. at 216.  At that point, the Government provided Ahrensfield's counsel with a copy of the transcript of Bryan's interview with the FBI.  Ahrensfield's counsel read through the transcript over the lunch hour, but later informed the Court that there was a significant amount of *Brady* material in the transcript and requested additional time to highlight relevant portions of the transcript that could be used during the cross-examination of Bryan. Ahrensfield's counsel also made an oral motion to dismiss the case due to the Government's alleged *Brady* violation.  The Court allowed counsel to take a break to review the transcript, and the trial continued later that afternoon.

The next morning, Ahrensfield filed his Motion to Dismiss, asserting that the transcript of Bryan's interview contained *Brady* material, that the Government had improperly withheld the transcript, and that the indictment against Ahrensfield should be dismissed due to the Government's misconduct.   Prior to the resumption of trial testimony that morning, the Court held an evidentiary hearing on the issue of whether the Government had provided the transcript to Ahrensfield before commencement of the second trial. During the hearing, Ahrensfield discovered that the Government had also failed to provide a transcript of a phone call that Bryan had made to the FBI prior to the interview. Because the Court needed to hear testimony on the Motion to Dismiss from additional witnesses, the Court continued the evidentiary hearing, deferred ruling on Ahrensfield's Motion to Dismiss, and resumed the trial.   The following day,

December 16, 2010, the jury returned a guilty verdict.

On December 20, 2011, the Court heard additional testimony regarding the alleged *Brady* violation and took the Motion to Dismiss under advisement.  Due to a number of issues that arose following the evidentiary hearing, and due to the fact that Ahrensfield filed a number of supplemental brief's and exhibits, the Court instructed Ahrensfield to file one consolidated motion that contained the entirety of Ahrensfield's arguments regarding the alleged *Brady* violation.

On March 11, 2011 Ahrensfield filed his consolidated *Brady* Motion as instructed by the Court.  In his *Brady* Motion, Ahrensfield argues that in addition to failing to provide Ahrensfield with a copy of the interview and phone call transcripts, the Government also failed to provide Ahrensfield with a copy of the audio recordings of the interview and phone call until after the trial had concluded.  Moreover, Ahrensfield said that the Government failed to provided Ahrensfield with a laboratory report indicating that the substance Gilbert Montoya sold to the confidential informant tested positive for cocaine.  Thus, Ahrensfield identified three separate alleged *Brady* violations—the failure to provide the transcripts until the middle of the trial, the failure to provide the recordings until after the trial, and the complete failure to provide the laboratory report.

## DISCUSSION

"To establish a *Brady* violation, a defendant must demonstrate that (1) the prosecutor suppressed evidence; (2) the evidence was favorable to the defendant as exculpatory or impeachment evidence; and (3) the evidence was material."  *United States v. Walters*, 269 F.3d 1209 (10th Cir. 2001) (quotation marks omitted). With respect to the first element, "negligent or inadvertent suppression of evidence is nevertheless suppression for *Brady* purposes." *Fero v.*

6

*Kerby*, 39 F.3d 1462, 1472 (10th Cir. 1994).  Thus, the mere fact that the evidence was

suppressed is all that is required to establish the first prong of the *Brady* violation test and the

Court is not required to also conclude that the Government intentionally or deliberately

suppressed evidence.  *See id.* With respect to favorability, a defendant can establish that

evidence is favorable by showing that the evidence is either exculpatory evidence or

impeachment evidence. *See Smith v. Secretary of New Mexico Dept. of Corrections*, 50 F.3d 801,

825 (10th Cir. 1995) (noting that "[i]mpeachment evidence, as well as exculpatory evidence,

falls within the *Brady* rule" because "if disclosed and used effectively, [such evidence] may

make the difference between conviction and acquittal").  Such "[e]vidence . . . need not

conclusively exonerate a defendant" and "the evidence need only be 'favorable' to the defense."

*Gonzales v. McKune*, 247 F.3d 1066, 1075 (10th Cir. 2001) *reversed on other grounds by*

*Gonzales v. McKune*, 279 F.3d 922 (10th Cir. 2002).

       With respect to the third element, materiality, the "evidence at issue is material only if

there is a reasonable probability that, had the evidence been disclosed to the defense, the result

of the proceeding would have been different. A 'reasonable probability' is a probability

sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682

(1985). "The materiality of the evidence must be evaluated in light of the entire record to

determine whether the evidence creates a reasonable doubt that did not otherwise exist." *Wilson*

*v. Carr*, 59 F.3d 179 (10th Cir. 1995) (unpublished). This must be done "with an awareness of

the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial

would have taken had the defense not been misled by the prosecutor's incomplete response."

*United States v. Guitierrez-Hermosillo*, 142 F.3d 1225 (10th Cir. 1998) (quoting *Strand v.*

*United States*, 780 F.2d 1497, 1504 (10th Cir. 1995) (McKay, J., dissenting)).  "The question is

7

not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *United States v. Ford*, 550 F.3d 975, 983 (10th Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).  Thus, a finding that the evidence is material does not require "that the evidence be sufficiently strong to ensure an acquittal had it been presented at trial."  *Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir. 2009).  Where *Brady* material is provided to a defendant during trial, the materiality inquiry shifts to "whether there is a reasonable probability that the outcome of [the trial] would have been different had the [Government] disclosed th[e] information earlier."  *Knighton v. Mullin*, 293 F.3d 1165, 1172-73 (10th Cir. 2002).

## A. The Interview and Phone Call Transcripts

The first alleged *Brady* violation involves the transcripts of the FBI's interview with Shawn Bryan (Interview Transcript) and the phone call that Bryan made to the FBI (Phone Call Transcript).  As noted above, in order for the Court to conclude that the Government violated its *Brady* obligations, Ahrensfield must demonstrate that the transcripts were suppressed, favorable, and material.  While the Court concludes that the transcripts were both suppressed and favorable, the Court also concludes that Ahrensfield failed to meet his burden of showing that the transcripts were material and that the Government therefore commited a *Brady* violation.

## (1) The Prosecutor Suppressed Evidence

The parties disagree over whether the prosecutor in fact suppressed the transcripts. Ahrensfield contends that the transcripts were suppressed because the prosecutor did not provide Ahrensfield with a copy of the transcripts until the midst of trial.  The Government, on the other hand, asserts that it made the transcripts available at the reception area of its office long before

8

the beginning of the second trial and that it notified Ahrensfield's counsel that the transcripts were available to be picked up.  Thus, the Government contends that it should be deemed to have met its obligations under *Brady* because it was Ahrensfield's counsel's failure to pick up the transcripts that precluded Ahrensfield from receiving the transcripts in a timely manner, not the Government's failure to produce them.

At the December 15, 2010 evidentiary hearing, three employees from the Bowles & Crow law firm testified and two employees from the U.S. Attorney's office testified.  At the continuation of the evidentiary hearing on December 20, 2010, a third employee from the U.S. Attorney's office also testified.  Based on the testimony of those witnesses, the Court makes the following factual findings.

On November 18, 2010, Nikki Lueck, a legal assistant in the U.S. Attorney's office, contacted the Bowles & Crow law firm regarding discovery in an unrelated case.  Lueck spoke to Melinda Zamora, a legal assistant at Bowles & Crow.  Lueck asked Zamora whether Zamora would prefer Lueck to mail the discovery to the firm or whether Zamora would prefer to pick the discovery up at the U.S. Attorney's office.  Zamora responded that she would pick up the discovery.  However, when Zamora went to the U.S. Attorney's office later that day, she was told that there was nothing there for the Bowles & Crow firm.

Sometime before November 30th, and probably sometime between November 15 and November 19, 2010, the prosecutor, Assistant United States Attorney Tara Neda, gave her legal assistant, Melissa Murphy, a copy of the transcripts and asked her to get copies to Ahrensfield's counsel, Jason Bowles, at the Bowles & Crow firm.  Evidentiary Hearing Tr. Vol. I at 21:9-23 (Doc. No. 148). Murphy called Bowles' office and informed the individual she spoke to that the documents would be available at the reception area of the U.S. Attorney's office.  According to

9

Murphy, the woman who answered the phone at Bowles' office stated that she would be right there to get the documents.  Zamora, the legal assistant at the Bowles & Crow firm, was not the individual with whom Murphy spoke. After getting off the phone, Murphy spent about fifteen minutes "complet[ing] a little bit more stuff" and then put the transcripts in a manila folder which Murphy then placed in the outgoing box at the U.S. Attorney's reception area. Evidentiary Hearing. Tr. Vol. II. at 71:1 (Doc. No. 149).

On December 1, 2010, Jordan Gull, a runner at the Bowles & Crow law firm, went to the reception area of the U.S. Attorney's office to drop off some invitations for a Christmas party. While she was at the U.S. Attorney's office, Gull asked the receptionist whether any documents were there for the Bowles & Crow law firm.  The receptionist, Desiree Salazar, advised Gull that nothing was there for the firm.  While Salazar remembered Gull dropping off the invitations, Salazar could not remember whether Gull had asked if there were any documents.  Gull testified that Salazar only looked around on her desk before stating that there was nothing for the firm; however, Salazar testified that she would never only look on her desk and that she would always get up and look in the outgoing box, which was on a table behind her desk.  In addition, Salazar testified that if she were asked for a package and could not find it, she would email the legal assistant working the case to let the legal assistant know that someone was at the desk looking for the package. While the testimony of these two witnesses is somewhat contradictory, the Court concludes that the difference between what Gull stated she observed and what Salazar stated was her normal practice does not raise a credibility issue with either of the witnesses. Gull may not have paid close attention to where Salazar was looking, and the fact that Salazar would typically call the legal assistant working on a case if a package was not present is not relevant in a situation where someone only asks, in general, whether there were any packages

10

instead of whether a specific package was ready for pickup.  Without specific information about what Gull was picking up, Salazar would not have known whom to call.  Thus, the fact that Salazar did not make a call does not convince the Court that Gull did not ask whether there were any packages and the Court finds that on December 1, 2010, Gull asked in a general way for the discovery but was told that there was nothing for the firm.

Sometime during the early part of the next week, which began Monday, December 6th, Salazar noticed that there were two envelopes in the outgoing box for the Bowles & Crow firm. Salazar did not recall seeing the envelopes prior to the week of December 6 and she "kn[e]w it was the beginning of . . . the week of December 6th" because she "kept seeing [the envelopes] over and over." Evid. Tr. Vol. II p 55-56 ln 25-3.  Salazar testified that she checks the outgoing box every day and that the first time she remembered seeing the packages was the week beginning December 6th. Salazar noted that if she sees a package in the outgoing box that has not been picked up for two to three weeks, she will email the legal assistant who placed the package in the box to notify the assistant that the package is still there.  Salazar did not send any emails regarding either of the envelopes for the Bowles & Crow firm.  At the end of the week of December 6, Salazar bound the two envelopes together with a rubber band because Salazar was concerned that if she was not at her desk, someone might accidentally give out only one of the two envelopes.  While Salazar generally works from 8:30 to 5:00, one of four administrative assistants serve as Salazar's backup at the reception desk if Salazar is at lunch or on a break.

Based on these factual findings, the Court concludes that the prosecutor suppressed the transcripts.  Due to some mistake at the U.S. Attorney's office, the transcripts were never provided to Bowles & Crow.  On two occasions, November 18 and December 1, employees of Bowles & Crow went to the reception area at the U.S. Attorney's office and asked generally if

there were any packages for the firm.  On both occasions, the employees were told that there was nothing there for the firm.  The employees were informed that there was nothing in the outgoing box for the firm despite the fact that there were actually two envelopes in the box that should have been provided to the employees—the discovery in the unrelated case and the transcripts at issue in this case. Because the Court finds the testimony of Zamora and Gull to be credible, and because the Court also finds the testimony of Lueck, Salazar, and Murphy to be credible, the only conclusion that the Court can reach is that either the envelopes were inadvertently overlooked when Zamora and Gull asked if there were any packages for the firm or the envelopes were inadvertently placed in a location other than the outgoing box and not returned to the box until some time after December 1, 2009 but before December 6, 2009.  Because the Government had exclusive control over the outgoing box where the transcripts were eventually located, and because the Government failed to provide the transcripts to Ahrensfield's counsel despite repeated attempts to obtain the transcripts, the Court concludes that the Government suppressed the transcripts.

The Court wishes to emphasize, however, that while the Court concludes that the prosecutor failed to provide Ahrensfield with the transcripts prior to trial, the Court also concludes that the failure was not intentional and was instead the result of negligence or mistake. The Court found credible the testimony that the prosecuting attorney instructed Murphy to get the transcripts to Bowles & Crow sometime in mid-November. The Court therefore concludes that the prosecutor did not act in bad faith.  As the Court has already noted, the fact that the suppression of the evidence was not intentional is not relevant as evidence is considered to have been suppressed, for purposes of determining whether a *Brady* violation occurred, regardless of whether it was done negligently or inadvertently.

**(2) The Evidence Was Favorable To The Defense**

With respect to the second element, favorability, the Government does not appear to dispute that the evidence contained in the transcripts was favorable to Ahrensfield defense.  And, given that the transcripts contained a number of statements that implicated individuals other than Ahrensfield as having been the source of the specific details of the investigation, the Court concludes that the transcripts contained potentially exculpatory information and were therefore favorable to the defense.

**(3) The Suppressed Evidence was Not Material**

The Court considers the materiality of the suppressed evidence to be a close and difficult issue.  Because the transcripts were provided to Ahrensfield during trial, the Court must determine, when addressing whether the suppressed evidence was material, whether the outcome of the trial would have been different had Ahrensfield been provided with the information earlier.  *See Knighton*, 293 F.3d 1165 (10th Cir. 2002).  In making this determination, the Court must "view the suppressed evidence's significance in relation to the record as a whole, keeping in mind that what might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict."  *Smith*, 50 F.3d at 827 (quotation marks, alteration marks, and citations omitted).

In his interview with the FBI, Shawn Bryan made a number of statements that Ahrensfield contends are material to his defense.  Bryan was interviewed by two FBI Agents: Drew McCandless and Marcus Washington.  During the interview, Bryan asserted that Ahrensfield only told Bryan a rumor about the investigation and that Bryan actually learned the details of the investigation from two sources: Darren White and Joe Hudson.  Bryan told the FBI

agents that Darren White was providing information by having his wife, Kathy White,[3] send text messages to Shawn Byran's wife, Erika Bryan. Interview Transcript at 54. Bryan also asserted that when he met with Joe Hudson on the morning of September 23, 2010, Hudson provided Bryan with a number of additional details of the investigation. *Id.* at 24, 31.

Ahrensfield identifies four different ways in which he would have used the evidence in the transcripts had he received the transcripts prior to trial. Ahrensfield contends that each of the four ways he would have used the evidence is sufficient to establish that the transcripts were material and that the outcome of the trial would have been different if Ahrensfield had received the transcripts earlier. First, Ahrensfield asserts that he could have used the transcripts of the interview and phone call to prepare extensive cross-examination of Shawn Bryan, Agent McCandless, and Agent Washington. Second, Ahrensfield states that he could have obtained a subpoena for Erika Bryan's phone and could have had a computer expert attempt to retrieve the text messages that Ms. Bryan allegedly received from Darren White's wife. Along these same lines, Ahrensfield also asseverates that he would have subpoenaed Erika Bryan and Kathy White to testify at trial about the contents of the text messages that were sent on the night of September 22, 2009. Third, Ahrensfield maintains that he would have used the information in the transcript to cross examine Joe Hudson. Finally, Ahrensfield declares that he would have used the transcripts to cross-examine Darren White regarding whether White provided information to Shawn Bryan.

In its Response, the Government asserts that the information in the transcripts was not

---

[3]The parties variably refer to Kathy as Kathy White and Kathy McConnely. It appears that Ms. White changed her name during the course of the proceedings and the Court will therefore refer to her by her married name, Kathy White.

material because Ahrensfield was able to cross-examine Shawn Bryan and Agent McCandless with the information contained in the transcripts, the text messages would not have been producible at trial, and Ahrensfield was able to introduce, through other witnesses, all of the evidence he claims he was denied.

**1.  Cross Examination of Shawn Bryan, Agent McCandless, and Agent Washington**

Ahrensfield first argues that he was denied the opportunity to effectively use the Interview Transcript and the Phone Call Transcript to cross-examine Shawn Bryan, Agent McCandless, and Agent Washington. However, with respect to the interview transcript, Ahrensfield did in fact use the transcript extensively during his cross-examination of Shawn Bryan.  And with respect to the telephone call transcript, the Court permitted Ahrensfield to recall Agent McCandless and Ahrensfield conducted an extensive cross-examination focused solely on the content of the telephone transcript.  Trial 2 Tr. at 411-419.  While the Court acknowledges that Ahrensfield's counsel had a limited amount of time to review the transcript prior to conducting his cross-examination, Ahrensfield has not pointed to anything in either transcript that could have been used differently if Ahrensfield's counsel had more time to review the transcripts. Further, Ahrensfield has not identified anything in the Interview Transcript that Ahrensfield would have used to cross-examine Agent McCandless or Agent Washington.  Thus, the Court concludes that Ahrensfield has not demonstrated that there is anything in either transcript that, had Ahrensfield received the transcripts earlier, could have been used in such a way that the outcome of the trial might have been different.  In addition, the Court's confidence in the jury's verdict is not undermined by the fact that Ahrensfield's counsel only had a limited time to review the transcripts before using their contents during his cross-examinations. Because Ahrensfield's counsel was able to make use of the transcripts during his cross-examinations,

Ahrensfield was not denied a fair trial.

**2. Text Messages**

  As an initial matter, Ahrensfield's argument with respect to the text messages raises an interesting question regarding the Government's obligations under *Brady* in that the transcript itself does not contain the evidence that Ahrensfield believes was material.  Rather, the transcript only contains information about the existence of *other* evidence that was not in the possession of the Government—the testimony of Erika White, the testimony of Kathy White, and the potential that text messages might be retrievable from Erika Bryan's cell phone.   However, the Tenth Circuit has, in a number of cases, indicated that *Brady* encompasses evidence that "in the hands of the defense . . . , could have been used to uncover other leads and defense theories."*Bowen v. Maynard*, 799 F.2d 593, 612 (10th Cir. 1986).  Thus, the fact that the suppressed transcript contains information that would have enabled Ahrensfield to obtain additional evidence allows the Court to determine whether the Government violated its *Brady* obligations with respect to the information in the transcript about the text messages.

  Ahrensfield argues that the interview transcript contains material information regarding the text messages that were sent from Kathy White to Erika Bryan.  In his interview with the FBI, Shawn Bryan stated that Kathy White was sending text messages to Erika Bryan in "September, October, and November" and that "Kathy is the one that exposed" information to Bryan.  Interview Transcript at 55:15-17, 56:1.  Bryan claimed that it was Kathy White, not Ahrensfield, who provided the names of the officers involved in the undercover investigation. *Id.* at 56:16-18.  However, when Agent McCandless told Bryan "that doesn't have anything to do with you knowing [the name of one of the officers] on the 22nd" of September, Bryan stated that he "didn't know [the name of that officer] on the 22nd" and that he actually "didn't know it was

[that officer] until late November . . . or early December" because "[t]hat's when we started finding out everything." *Id.* at 56:16-25. When questioned about the text messages at trial, Bryan testified that Darren White, through his wife, was getting information to Bryan about the investigation and that Darren White's wife was "texting [Bryan's] wife on a hourly, if not daily basis, giving us all the details of every little background thing that was going on with this investigation." Trial 2 Tr. at 272:8-11. When asked to clarify the exact time frame that the messages began, Bryan explained that White's wife began sending the messages "immediately . . . the morning that it all happened." Trial 2 Tr. at 273:16-25. At the first trial in this matter, Bryan made no mention of these text messages.

Ahrensfield contends that by failing to provide the Interview Transcript, the Government prevented Ahrensfield from obtaining Erika Bryan's cell phone, a phone from which Ahrensfield states a computer expert could have attempted to retrieve deleted text messages. In addition, Ahrensfield asserts that the Government's failure to provide the Interview Transcript precluded Ahrensfield from subpoenaing Kathy White and Erika Bryan to elicit testimony regarding the content of the text messages sent and received on September 22, 2010. Thus, Ahrensfield argues that he would have prepared for trial differently and would have been able to conduct additional investigation if he had been provided with the transcripts in a more timely manner.

The Government makes a number of arguments in its Response related to the text messages. First, the Government says that Ahrensfield has not demonstrated that the alleged text messages actually exist and that neither of the phone companies that provided service to Erika Bryan and Kathy White store text messages for longer than five days. Second, the Government asserts that Ahrensfield "had unrestricted access to [Shawn Bryan,] Erika Bryan and Kathy White" and that Ahrensfield therefore could have learned about the text messages by

interviewing those individuals even if the Government had not suppressed the transcripts. Third, the Government maintains that any testimony from Erika Bryan and Kathy White regarding the text messages is not material as it would have been irrelevant and cumulative.

The Government first argues that Ahrensfield's *Brady* claim should fail with respect to the text messages because Ahrensfield has not proven that the text messages were available. While it is true that the defendant must establish that evidence exists and that "[a] *Brady* claim fails if the existence of favorable evidence is merely suspected," *United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009), the Court concludes that Ahrensfield has met this burden with respect to the text messages. Even if the messages themselves were not recoverable, had Ahrensfield  known about the text messages he could have subpoenaed Erica Bryan and Kathy White—witnesses who could have testified about the content of the messages.  In addition, Ahrensfield might have been able to find phone records demonstrating the number of messages sent in the hours after Ahrensfield initially disclosed to Shawn Bryan that there was an ongoing investigation of Car Shop.  Given that Shawn Bryan testified that Kathy White provided some of the details of the investigation to Erika Bryan, the Court concludes that Ahrensfield has made a sufficient showing that evidence of the text messages does in fact exist and that the favorable evidence is therefore not "merely suspected."

The Government next asserts that it has no obligation to provide *Brady* material if a defendant could have accessed the evidence by interviewing a witness to whom the defendant had as much access as the Government had.  The Government contends that Ahrensfield had equal, if not greater, access to Shawn Bryan and Erika Bryan and therefore could have discovered that Shawn Bryan had received some of the details of the investigations via the text messages without the Government providing a copy of the interview transcript to Ahrensfield.

18

In support of this argument, the Government cites to *Erickson*, 561 F.3d at 1163, a case where, at first glance, the Tenth Circuit appears to have implicitly recognized such a rule.

In *Erickson*, the Tenth Circuit noted that "a defendant is not denied due process by the government's nondisclosure of evidence if the defendant knew of the evidence anyway."  In making this statement, the Tenth Circuit cited to a Sixth Circuit case and quoted in a parenthetical a statement from that case that "no *Brady* violation is possible when defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information' or when the evidence is available to him from another source, such as a witness 'to whom he had as much access as the police.'" *Id.* (citing *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)). The Government appears to argue that the Tenth Circuit's citation to *Coe* indicates that the Tenth Circuit would follow a similar rule and conclude that the Government cannot violate its *Brady* obligations when a defendant has as much access to a witness as the Government. However, the Government's reliance on *Erickson*, and thus *Coe*, is misplaced.

It is true that a number of the United States Circuit Courts of Appeal, including the Sixth Circuit, have concluded that the Government does not violate its *Brady* obligations when the defendant knew or should have known of the evidence—such as when a defendant could have gleaned the information from a pre-trial interview of a witness to whom the defendant has access.  The Sixth Circuit Court of Appeals, for example, has held that the government does not violate its *Brady* obligations by failing to provide a defendant with copies of pre-trial statements made by witnesses if the defendant "was made aware prior to trial that [the witnesses] had information that possibly could exculpate defendant" and the defendant "had the opportunity to interview" the witnesses.  *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990).  The Sixth Circuit explained that there was no *Brady* violation because the "defendant was aware of the

19

essential facts that would enable him to take advantage of the exculpatory evidence." *Id.*
Similarly, the Eleventh Circuit has held that "the *Brady* rule does not apply if the evidence in
question is available to the defendant from other sources." *United States v. Davis*, 787 F.2d
1501, 1505 (11th Cir. 1986). In *Davis*, the Eleventh Circuit upheld the district court's
determination that the government had not violated its *Brady* obligations because the defendants
"knew the identities of the government's witnesses prior to trial and had reasonable access to
them so that they could have discovered the inconsistent statements." *Id.* Like the Sixth and
Eleventh Circuit's, the Second Circuit Court of Appeals rejected a defendant's assertion that the
government had violated its *Brady* obligations by failing to produce grand jury testimony of two
individuals who testified at the grand jury but were not called at trial because the defendant "was
on notice of the essential facts required to enable him to take advantage of such exculpatory
testimony as [the witnesses] might furnish." *United States v. Ruggiero*, 472 F.2d 599, 604 (2nd
Cir. 1973). The Second Circuit noted that the defendant "knew the identity and location of [the
witnesses] and of the likelihood that they might give testimony helpful to his defense." *Id.*

   The underlying principle behind the Sixth, Eleventh, and Second Circuits' holdings that
the Government cannot violate *Brady* when a defendant knew or should have known about the
existence of evidence is that if the defendant has knowledge of evidence, or if the evidence is
available from a source to whom the defendant has equal access, the Government has not
suppressed evidence. *See e.g. Todd*, 920 F.2d at 405. Thus, in those Circuits, whether a
defendant knew or should have known of the existence of evidence relates to the first element of
the *Brady* test—whether the Government suppressed evidence.

   While the Tenth Circuit has also articulated a "knew or should have known" rule, the
Tenth Circuit's articulation of that rule is markedly different from the rules in the Sixth,

Eleventh, and Second Circuits.  In *Banks v. Reynolds*, 54 F.3d 1508, 1517 (10th Cir. 1995), the Tenth Circuit noted that "[w]hether the defense knows or should know about evidence in the possession of the prosecution certainly will bear on whether there has been a *Brady* violation" and "[o]bviously, if the defense already has a particular piece of evidence, the prosecution's disclosure of that evidence would, in many cases, be cumulative and the withheld evidence would not be material." The Tenth Circuit made clear, however, that "the prosecution's obligation to turn over the evidence in the first instance stands independent of the defendant's knowledge" and that "the fact that defense counsel 'knew or should have known' about the [suppressed] information . . . is irrelevant to whether the prosecution had an obligation to disclose the information."  *Id*. Citing *Banks*, the Tenth Circuit later reiterated that a defendant's independent awareness of the exculpatory evidence is critical in determining whether a *Brady* violation has occurred" and that "[i]f a defendant already has a particular piece of evidence, the prosecution's disclosure of that evidence is considered cumulative, rendering suppressed evidence immaterial."  *United States v. Quintanilla*, 193 F.3d 1139, 1148 (10th Cir. 1999).

Thus, unlike the Sixth, Eleventh, and Second Circuits, the Tenth Circuit's "knew or should have known" requirement only applies to the materiality determination, not the determination of whether the government violated its *Brady* obligations. The Tenth Circuit has explained that "if the defense already has a particular piece of evidence, the prosecution's disclosure of that evidence would, in many cases, be cumulative and the withheld evidence would not be material." However, the Tenth Circuit has not explained how evidence about which defendant should have known affects the materiality of suppressed evidence.  While evidence that a defendant already knows is clearly cumulative, evidence that a defendant does not know about  certainly cannot be deemed to be cumulative.  Thus, it is not clear how Ahrensfield's

21

failure to learn about the text messages on his own should factor into the Court's materiality analysis. Resolution of this uncertainty is unnecessary, however, for two reasons.

First, it is unlikely that the Tenth Circuit, despite having cited to *Coe* in *Erickson*, would apply its "knew or should have known" standard to information that a defendant could have learned by interviewing a witness. In fact, in *United States v. Robinson*, 39 F.3d 1115, 1117 (10th Cir. 1994), the Tenth Circuit concluded that the government violated its *Brady* obligations by failing to disclose information the government learned while interviewing a witness despite the fact the defendant, who "was free to interview [the witness] or call him to testify," had not interviewed the witness. Thus, the Tenth Circuit has implicitly recognized that a defendant's ability to obtain information from a witness has no bearing on whether the Government has suppressed evidence *or* whether evidence is material. While there are some types of information, such as readily available public information, that a defendant might be deemed to have known about, *see United States v. Brown*, 398 Fed.Appx 352 (10th Cir. 2010) (unpublished) (noting that alleged *Brady* information "was publicly available" and that "the government did not withhold or suppress [the] evidence"), evidence obtained from a witness does not fit in this category as the information that a witness provides to the government could be markedly different from the information that a witness provides to the defendant. If the Government were able to avoid its *Brady* obligations by asserting that the defendant could just as easily have gleaned the information from the witness prior to trial, then the government would never have a duty to disclose exculpatory information that it learns from its witness prior to trial unless the defendant has no access to the witness whatsoever. Thus, the Court believes that the Tenth Circuit is not likely to adopt a rule that relieves the Government of its *Brady* obligations when a defendant could, but fails, to learn exculpatory information from a Government witness even when the

22

defendant has equal or greater access to the witness.

Second, even if the Tenth Circuit were to hold that a defendant should have known information that he could have obtained by interviewing a witness, the Court concludes that the information that the Government obtained from Shawn Bryan after the first trial was not information that Ahrensfield reasonably should have known existed.  At the first trial, Bryan testified extensively about where he had learned the details of the investigation but did not ever mention the fact that he had received some of the details of the investigation via the text messages to his wife.  Ahrensfield therefore had no reason to believe that an additional interview of Bryan would have lead to the discovery of that evidence.  *See id.* at 1117 n.2 (noting that the information the government provided "could easily have led [the defense attorney] to conclude that [the witness] possessed no knowledge relevant to [the defendant's] defense").  Thus, the Court concludes that contrary to the Government's argument, the fact that Ahrensfield may have had access to Bryan after the first trial did not relieve the Government of its *Brady* obligations given that the Government learned of exculpatory information that neither party was aware of at the first trial.

Having concluded both that the Ahrensfield met his burden of showing that evidence regarding the text messages exists and that the Government is not relieved of its *Brady* obligations merely because Ahrensfield could have interviewed Bryan, the Court must next determine whether the evidence was material.  While the Government clearly violated its *Brady* obligations by failing to disclose the content of Shawn Bryan's interview to Ahrensfield, Ahrensfield is not entitled to a new trial unless the information about the text messages is material.

The thrust of Ahrensfield's materiality argument is that "the jury could have been left

with a reasonable doubt that Ahrensfield was the source of [Shawn] Bryan learning all of the[] details" about the undercover investigation and that Bryan "instead learned [the details] from other sources." *Brady* Motion at 29. It thus appears that Ahrensfield is arguing that if the jury believed that someone other than Ahrensfield had provided Shawn Bryan with the details of the investigation, the jury might have concluded that Ahrensfield did not intend to obstruct justice. Ahrensfield contends that because this was a close case, any evidence that is probative of Ahrensfield's intent could have led the jury to conclude that Ahrensfield did not intend to obstruct justice. Ahrensfield does not, however, make it entirely clear how testimony about the text messages would give rise to a reasonable probability that the outcome of the trial would be different nor does he explain exactly why the fact that the jury did not hear testimony from Erika Bryan or Kathy White should undermine the Court's confidence in the jury's verdict.

The Court agrees with Ahrensfield's assertion that this was a close case. After approximately seven hours of deliberation, the jury indicated that it had voted twice but was unable to reach a unanimous decision. Note From the Jury (Doc. No. 136). In fact, it was only after the Court gave a modified *Allen* charge that the jury ultimately returned its guilty verdict. In addition, the jury in the first trial was unable to reach a unanimous verdict on the obstruction of justice charge. It is also true that "what might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict." *Smith*, 50 F.3d at 827 (quotation marks, alteration marks, and citations omitted). Where evidence of guilt is overwhelming, even egregious *Brady* violations have been held insufficient to undermine confidence in a jury's decision. *See e.g. Gonzales v. McKune*, 247 F.3d 1066, 1077 (10th Cir. 2001) (concluding that Government's suppression of evidence was not material because there was "strong evidence of guilt, and the *Brady* material [was] only equivocal"); and *Fero v. Kerby*, 39 F.3d 1462, 1473

24

(10th Cir. 1994) (concluding that suppressed evidence was not material because "there was strong evidence indicating that [the defendant] deliberately killed [the victim] and supporting the first degree murder conviction"). But, in cases where there is minimal evidence of guilt, evidence that might seem insubstantial may be sufficient to undermine confidence in the outcome of a trial. *See e.g. Trammell v. McKune*, 485 F.3d 546, 552 (10th Cir. 2007) (noting that in "a close case," evidence that had the potential to undermine the testimony of eyewitnesses and corroborate the defendant's theory of the case was sufficient to undermine the court's confidence in the outcome of the trial even though the court was not convinced that timely disclosure of the evidence "would have resulted in a different result").

Ahrensfield does not dispute that he disclosed the existence of the undercover operation to Shawn Bryan on September 22, 2009. Thus, the only disputed issue that the jury had to consider was whether Ahrensfield acted corruptly and whether he intended to obstruct justice. And, given that Ahrensfield testified that he did not intend to obstruct a federal proceeding, the only evidence of Ahrensfield's intent was circumstantial evidence. In order to prove that Ahrensfield acted corruptly and that he intended to obstruct justice, the Government focused on Ahrensfield's behavior at the time that he talked to Shawn Bryan and in the days after he leaked the investigation. Specifically, the Government honed in on Ahrensfield's odd behavior on the night he met Bryan—calling from a payphone, driving a different vehicle, and asking Bryan to meet outside of his community wearing a hat. The defense, however, focused on whether Ahrensfield had provided Shawn Bryan with details of the investigation. In his closing argument, Ahrensfield's counsel argued that the Government had not proved that Ahrensfield had the wrongful intent to obstruct justice because the Government had not "come close to proving that [Ahrensfield] knew and that he intended to obstruct a proceeding." Tr. Vol. III

521:17-25.  Counsel further argued that it was not clear, even to Ahrensfield's counsel, "what

Ahrensfield was told" or "what [Shawn] Bryan was told." Tr. Vol III 522:1.  Thus, defense

counsel made Ahrensfield's knowledge of the details of the investigation, and the extent of the

details that Ahrensfield provided to Bryan, a focal point of Ahrensfield's defense.

 The Court agrees with Ahrensfield that the number of details Ahrensfield provided to

Shawn Bryan about the investigation is probative of Ahrensfield's intent.  Given that the jury

was required to infer Ahrensfield's intent from circumstantial evidence, the jury could have been

persuaded that Ahrensfield did not intend to obstruct justice by evidence that someone other than

Ahrensfield was the person who provided the specific details of the investigation to Bryan.  If

the jury was convinced that Ahrensfield only generally told Bryan that there was a rumor that

Car Shop, or an employee of Car Shop, was under investigation, but that Ahrensfield did not

identify exactly what the investigation entailed, who was selling drugs, or who the confidential

informant was, the jury could have determined that Ahrensfield did not intend to obstruct justice.

Thus, if the jury heard testimony that some of the details Bryan was aware of the morning of

September 23 had come from an individual other than Ahrensfield, the jury may have reached a

different conclusion as to Ahrensfield's guilt.  The jury, however, heard testimony that

established that every detail of the investigation Bryan was aware of the morning of September

23, 2009 had come from a source other than the text messages.  In fact, the jury heard testimony

elicited by the defense that the majority of the details had come from Joe Hudson, not

Ahrensfield.  And, despite hearing testimony that Ahrensfield was not the source of a significant

number of the details, the jury nevertheless returned a guilty verdict.

 At trial, Joe Hudson testified that when he met with Shawn Bryan on the morning of

September 23, 2009, Bryan was aware of a number of details of the investigation.  Specifically,

Hudson testified that Bryan was aware that the investigation involved stolen merchandise and drug trafficking, that a confidential informant was being used against Gilbert Montoya, and that confidential informant's name was Carlos.  TR 123:3-14, 128:5-10.  Similarly, Robert Smith testified that on the morning of September 23, 2009, Bryan informed Smith that he was aware of the undercover investigation, that he knew it involved allegations of drug trafficking and stolen merchandise, and that he knew that a confidential informant was being used.  Trial 2 Tr. 152:4-15.

During his direct examination, Ahrensfield testified that he did not tell Bryan that Gilbert Montoya was the individual from whom the confidential informant had purchased drugs.  In fact, Ahrensfield testified that he did not even know that Montoya was involved.  Trial 2 Tr. at 444:2-8.  Ahrensfield testified that when Bryan got into Ahrensfield's car, Ahrensfield only told Bryan that "your mechanic is dealing drugs." Trial 2 Tr. at 454.  Bryan also testified that on September 22, 2009 Ahrensfield told Bryan that Ahrensfield had "heard a rumor that [Bryan was] a sergeant major[4] of a crime ring."  Trial 2 Tr. 77:8-10. When asked whether Ahrensfield had told him whether a confidential informant was involved, Bryan testified that Ahrensfield had only told him "that they were talking to somebody; that somebody had started a rumor that [Bryan] was a drug dealing crime lord."  TR 226:15-17.  When confronted with his grand jury testimony, which differed from his trial testimony, Bryan explained that he had previously answered "yes" to the question of whether Ahrensfield had told him that there was a confidential informant involved because he had been cornered into answering "yes" or "no" to questions.  Trial 2 Tr. at 226.

When questioned about whether Ahrensfield had told him that he was suspected of

---

[4] Bryan testified that a sergeant major is a leader.

dealing in stolen merchandise, Bryan testified that "it wasn't until the next morning that I was

told about the stolen goods thing." Trial 2 Tr. at 227:17-19. When asked whether Ahrensfield

had told him that Gilbert Montoya was dealing drugs, Bryan stated "no, that is not true."  Trial 2

Tr. at 228:13.  When confronted with his grand jury testimony, in which Bryan stated that

Ahrensfield had told him that "Gilbert was being suspected of dealing large amounts of drugs

through the dealership," Bryan stated that it wasn't Ahrensfield that had told him about Gilbert

Montoya, that it was "the gentleman right there."[5] Trial 2 Tr. at 228. After repeated questioning

about whether Ahrensfield had named Gilbert Montoya, Bryan stated that Ahrensfield had "said

that one of my employees was suspected of doing something wrong" and that "in the course of

the next 12 hours, there was a lot of information gathered."  Trial 2 Tr. at 233:22-25. Based on

this information, Bryan was able to identify the employee as Gilbert Montoya. Bryan later noted

that he had four conversations with Joe Hudson on the morning of September 23, 2009, that

Hudson had told Bryan various details about the investigation, and that it was Hudson who had

"mention[ed] Gilbert [Montoya's] name, [and] that Gilbert was suspected of some wrongdoing."

Trial 2 Tr. at  294:8-22.

    When asked about his meeting with Joe Hudson, Bryan testified that when he first met

with Hudson, Bryan told Hudson that he had "been told that there was a rumor that we were

being looked into and that I was being made out to be a crime lord." Trial 2 Tr. 240:16-19.

Bryan then stated that he had a meeting with Hudson "about an hour later, and [Hudson]

_____

[5]It is not clear who Bryan was referring to when he made this comment.  However, it was
likely that Bryan was referring to one of the FBI agents sitting at counsel table as Bryan later
stated that "the two gentlemen sitting there came in came in and told me that they had all that
videotape of Gilbert smuggling large amounts of drugs through our dealership."  TR 231:7-14.
Regardless of the exact identification of the individual Bryan was referring to, it is clear that
Bryan was *not* referring to a text message as the source of information about Gilbert Montoya.

elaborated into what was being said." Trial 2 Tr. 240:20. When asked whether he had given Hudson "all the details of the investigation that Brad Ahrensfield" had provided, Bryan testified that "that is not correct . . . Joe actually gave me more info than a rumor." Trial 2 Tr. 241:4-5. Bryan explained that he told Hudson that he "had been told a rumor that [he] was suspected of running a crime organization" and that Hudson then "made phone calls and started getting details." Trial 2 Tr. 241:16-19. Upon further questioning, Bryan again reiterated that "a lot of info had been exchanged" between himself and Hudson, that he "didn't have anything from [Ahrensfield] but a rumor," and that while he "gave details of the investigation," the details did not come from Ahrensfield. Trial 2 Tr. 243:5-9.

When questioned about whether he knew the name of the confidential informant, Bryan testified that he had learned the informants name "over time." When asked to elaborate, Bryan explained that "after I visited with Joe Hudson and found out that there was an informant through our conversation, what this informant was saying, I did quickly figure out who [the informant] was." Trial 2 Tr. at 257:11-16. Bryan went on to explain that "when Joe [Hudson] told me who - - - what the informant was saying, I did figure it out real quick, because he had come to my dealership." Trial 2 Tr. at 257:17-19.

On cross-examination, defense counsel asked Shawn Bryan a series of questions regarding the details that Ahrensfield had provided to Bryan about the investigation. When asked "[d]id Brad Ahrensfield ever tell you the name of the confidential informant," Bryan replied "No, he did not." Trial 2 Tr. at 285 ln 4-6. When asked "did Brad Ahrensfield ever tell you that Gilbert Montoya was going to be arrested," Bryan replied, "no, he did not. He was actually not even involved in that. He - - he'd heard a rumor." Trial 2 Tr. at 285:7-10. When asked "did Brad Ahrensfield even know they were focused on Gilbert Montoya," Bryan replied

29

"no, he didn't.  He knew that there was something going on, and it tied into my home and a whole lot of other things that had been going on.  And we started putting pieces together the next morning."  Trial 2 Tr. at 285:11-17.

The jury therefore heard a significant amount of testimony that the details of the investigation that Bryan knew the morning of September 23, 2009 came from someone other than Brad Ahrensfield.  In addition, the origins of all of the details that Joe Hudson and Robert Smith testified that Bryan was aware of—the fact that the investigation was taking place, that the FBI was involved, that Gilbert Montoya had sold drugs, and that a confidential informant was involved—are accounted for by the testimony adduced at trial.  Because the evidence at trial established that Bryan learned all of the details from Ahrensfield and Hudson, it is not clear what, if any, additional details Bryan learned prior to the morning of September 23 via the text messages. Even if the Court were to assume that testimony about the text messages would show that Bryan learned the same details from the text messages that he also allegedly learned from Joe Hudson, the Court's confidence in the verdict is not undermined because the jury already considered, and rejected, the assertion that Ahrensfield did not have the intent to obstruct justice because he did not provide all the details of the investigation to Bryan.  Evidence that some of the details also came from another source would be cumulative as Ahrensfield's theory of the case—that he did not have the intent to obstruct because he did not provide all the details—is the same whether the additional details Bryan knew came from one additional source or two or more additional sources.   The jury, having heard a significant amount of testimony that the details Ahrensfield provided to Bryan were vague and that the majority of the details came from Joe Hudson, nevertheless concluded that the details that Ahrensfield did provide were sufficient to indicate that Ahrensfield intended to obstruct justice.  Thus, the Court concludes that any

evidence that Bryan learned additional details about the investigation from the text messages is not material as it is not probable that the jury would have reached a different result had it heard additional evidence about the source of some of the details of which Bryan was aware.

### 3.  Cross Examination of Joe Hudson

Ahrensfield next argues that had he received the transcript prior to trial, he could have formulated an effective cross-examination of Joe Hudson to prove to the jury that Hudson, not Ahrensfield, provided the details of the investigation to Bryan.  While Ahrensfield argues that he could have used the information in the transcript to prove to the jury that a number of the details about the investigation were provided by Joe Hudson, the Court concludes that the transcript did not contain any information of which Ahrensfield was not already aware and thus the information in the transcript regarding Joe Hudson is cumulative and not material.

During his interview with the FBI, Shawn Bryan stated that Joe Hudson was the one who informed Bryan that Gilbert Montoya was dealing drugs and that there was a confidential informant involved. *See* Interview Transcript at 31.  According to Ahrensfield, if the Government had provided the transcript prior to trial, or perhaps even prior to Joe Hudson's testimony, Ahrensfield could have cross-examined Joe Hudson about whether Hudson gave Bryan the details of the investigation.  However, during his testimony in the first trial, Shawn Bryan stated that "Joe Hudson and Rob Smith and I . . . had an hour conversation and several phone calls before they decided to record me, and at that point, a lot of information had already been exchanged."  Trial 1 Tr. at 221:5-8.  Bryan also stated that Hudson and Smith "were the ones that made the allegations of drugs" and that "they were the ones that made the allegations of stolen goods."  Id. at 221:19-22.  Later in his testimony, and in response to the question "you're saying that Joe Hudson told you you were wiretapped?, Bryan stated that "Joe [Hudson]

31

said several things in the initial meetings."  Id. at 248 ln 6-7.

Thus, prior to the second trial Ahrensfield was aware of Bryan's allegation that Hudson had provided details about the investigation.  Despite having knowledge of those allegations, Ahrensfield's counsel did not ask a single question during the cross-examination of Hudson related to whether Hudson, not Ahrensfield, provided Bryan with details of the investigation. Because Ahrensfield was aware of the allegation that Hudson was one of the individuals that provided Bryan with details about the investigation prior to the second trial, and because Ahrensfield chose not to ask any questions during Hudson's cross-examination related to those allegations, the Court concludes that the information in the interview transcript related to Joe Hudson is not material as it duplicated information Ahrensfield already had. *See United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009) (noting that "a defendant is not denied due process by the government's nondisclosure of evidence if the defendant knew of the evidence anyway").

**4. Darren White**

Finally, Ahrensfield contends that he could have used the information in the transcripts to examine Darren White.  The Government did not present White as a witness in the second trial, so there was no opportunity to cross-examine White.  However, Ahrensfield does not address the fact that he affirmatively chose *not* to call Darren White as his own witness despite having subpoenaed White to testify.  Because Ahrensfield had a copy of the transcript prior to the conclusion of the trial, Ahrensfield could have called White as a witness during presentation of the defense witnesses and at that time used the information in the transcript while questioning White.  Having chosen not to call White as a witness and not even having attempted to use the information about White in the transcript, Ahrensfield cannot now complain that he was

deprived of the ability to effectively use the information in the transcript in his examination of

White.  Given that Ahrensfield subpoenaed, but did not even present White's testimony in his

defense, the Court's confidence in the jury's verdict is not undermined by the fact that

Ahrensfield did not use the contents of the transcript to examine White.

**B. Audio Recordings**

Ahrensfield next contends that the Government violated its *Brady* obligations by failing

to provide Ahrensfield with a copy of the audio recordings of Shawn Bryan's interview with the

FBI and Shawn Bryan's phone call to the FBI.  Ahrensfield notes, and the Government

concedes, that Ahrensfield  did not receive the audio recordings until after the trial concluded.

Ahrensfield argues that had he been provided with the audio recordings earlier, he could have

played the recordings for the jury, rather than read from the transcripts, when he used the

transcripts at trial.

As an initial matter, the Court questions whether the *Brady* doctrine applies to the

recordings.  While the Government failed to provide the recordings to Ahrensfield, the

Government did provide Ahrensfield with an accurate transcript[6] of the contents of the

recordings.  Thus, the evidence that is contained in the recordings was already made available to

Ahrensfield in the form of a transcript.  It appears to the Court that unless the recordings

contained additional evidence of which Ahrensfield was not already aware from having the

transcripts, *Brady* is inapplicable as *Brady* does not apply when a defendant is already aware of

the evidence.  However, even if the Court were to assume that the *Brady* doctrine applies to the

recordings, the Court nevertheless concludes that the Government's failure to provide the

---

[6]Ahrensfield does not contend that the transcript is erroneous or that it inaccurately
reflects the actual contents of the recordings.

recordings during trial did not constitute a *Brady* violation.

With respect to the three elements of a *Brady* violation, the Government concedes that Ahrensfield did not receive the audio recordings until after the trial had concluded, and the Court, in addressing the transcripts, has already found that the contents of the recordings were favorable to Ahrensfield's defense.  Thus, the only disputed issue is whether the recordings were material.  Ahrensfield contends that the recordings were material because his impeachment of Agent McCandless would have been more effective if Ahrensfield had been able to play portions of the recording to the jury rather than reading from the transcript.

While the Court acknowledges that playing a recording of a witness's prior statement to a jury could certainly be a more effective way to impeach the witness's credibility than reading the statement from a transcript, the Court disagrees that Ahrensfield's inability to play the recording is material.  Because the Ahrensfield read to the jury the portions of the transcript that Ahrensfield believed impeached Agent McCandless' testimony, the Court cannot conclude that there is any reasonable probability that the result of the trial would have been different if the jury had heard that same evidence in a different form.  Unless there is an inaccuracy in a transcript that alters the meaning of a statement in such a way that a jury could reasonably reach a different conclusion as to weight to give the statement, the difference between reading from a transcript and playing a recording is not meaningful enough that the Court's confidence in the jury's verdict could be undermined.  Thus, the Court concludes that even if *Brady* applies to the recordings, the recordings were not material.

## C. Laboratory Report

Finally, Ahrensfield contends that the Government violated its *Brady* obligations by failing to provide Ahrensfield with a copy of a laboratory report disclosing the results of a

34

chemical analysis of the drugs purchased by the confidential informant from Gilbert Montoya.

Ahrensfield states that he only learned of the contents of the lab report in an email from the

prosecutor and that the Government has still not provided a copy of the laboratory report to

Ahrensfield.  In that email, the prosecutor indicated that the drug that was submitted to the

laboratory tested positive for cocaine, not crack cocaine.  The Government acknowledges that it

has not provided Ahrensfield with a copy of the report, and thus concedes that the report was

suppressed.  Thus, the only remaining inquiry is whether the report is favorable and material.

Ahrensfield contends that the laboratory report is favorable and material because had

Ahrensfield known at trial that the substance only tested positive for cocaine, Ahrensfield could

have elicited testimony from the Government's witnesses that the amount of cocaine was

insufficient to warrant federal prosecution.  Ahrensfield argues that the failure of the

Government to give the lab report to Ahrensfield prevented Ahrensfield from rebutting the

Government's argument that there was a sufficient quantity of drugs to make a federal case.

In its Response, the Government explains that the substance was only tested to establish

the presence of cocaine, and not cocaine base, because under New Mexico law there is no

difference in the penalty between crack cocaine, or cocaine base, and pure cocaine, or cocaine

hydrochloride, and that it was thus unnecessary to test for cocaine base in the state court

prosecution of Gilbert Montoya.  The Government also points out that Ryan Buckner testified at

trial that the substance the confidential informant purchased appeared to Buckner's trained eye to

be crack, that the confidential informant had bargained with Gilbert Montoya for crack, and that

the recording of the sale included words consistent with the sale of crack such as "rocking it up."

*See* Trial 2 Tr. at 73-74.  Buckner also testified that while the substance tested positive in a field

test for cocaine, "it was packaged in a manner . . . which is consistent with crack cocaine."  Trial

35

2 Tr. at 73:3-11

In *United States v. McIntyre*, 997 F.2d 687, 710 (10th Cir. 1993), the Tenth Circuit Court of Appeals noted that it "has held that mere testimony concerning [a] substance is sufficient to support a finding that [the substance] is crack rather than cocaine hydrochloride." Thus, Ryan Buckner's testimony that the substance that the confidential informant purchased was crack is sufficient to support a finding that the substance was in fact crack cocaine. The fact that the substance was only tested for cocaine therefore did not preclude the Government from arguing that the substance was crack. The Court concludes that the lab report showing that the substance was only tested to determine if it contained cocaine is not favorable or material.

Because Ahrensfield has failed to show that any of the evidence that the Government suppressed was material, the Court concludes that Ahrensfield's *Brady* Motion should be denied.

IT IS ORDERED THAT Defendant Brad Ahrensfield's Consolidated Motion to Dismiss For Brady/Giglio Violations (Doc. No. 163) is DENIED.

IT IS FURTHER ORDERED THAT Defendant Brad Ahrensfield's Motion to Dismiss For Brady Violation (Doc. No. 121) is DENIED as moot.

_____
SENIOR UNITED STATES DISTRICT COURT JUDGE