**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                             No.    09-CR-3457

BRAD AHRENSFIELD,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

At the close of the Government's case-in-chief in a jury trial, Defendant Brad
Ahrensfield moved under Rule 29 of the Federal Rules of Civil Procedure for a judgement of
acquittal on the ground that the Government had failed to introduce sufficient evidence to prove
beyond a reasonable doubt that Ahrensfield was guilty of obstructing justice.  Having considered
the arguments raised by both parties, the applicable law, and the relevant portions of the trial
transcript, the Court concludes that the Government introduced sufficient evidence to prove
beyond a reasonable doubt that Ahrensfield was guilty of obstructing justice.

**PROCEDURAL BACKGROUND**

On December 13, 2010, Defendant Brad Ahrensfield was brought to trial on one count of
obstruction of justice.  At the close of the Government's case-in-chief, Ahrensfield moved for a
judgment of acquittal.  Due to the need to have the parties cite to the applicable portions of the
record, the Court took the motion under advisement and ordered Ahrensfield to brief the issue
and file a motion once the trial transcripts were completed.  The trial then resumed and, on
December 16, 2010, the jury returned a guilty verdict.  On February 8, 2011, Ahrensfield filed
his Motion for Judgement of Acquittal on the Charge of Obstruction of Justice (Rule 29 Motion)

(Doc. No. 158).  The Government filed a Response (Doc. No. 160) on February 22, 2011 and

Ahrensfield  filed a Reply (Doc. No. 162) on March 8, 2011.  Having considered the arguments

of both parties as well as the applicable law, the Court concludes that Ahrensfield's Rule 29

Motion should be denied.

## BACKGROUND

In September 2009, the Albuquerque Police Department received a tip from a

confidential informant that a criminal enterprise was operating out of Car Shop, a business in

Albuquerque, New Mexico.  The informant reported that Gilbert Montoya, a mechanic at Car

Shop, was selling narcotics.  The informant also alleged that three employees of Car Shop,

including Shawn Bryan, the owner of Car Shop, had purchased stolen property from the

informant in the past.  The informant contended that Bryan "ran the show" and that nothing took

place at Car Shop without Bryan's permission.  Trial 2 Tr. at 33.[1]  As a result of this information,

a task force that included members of the Albuquerque Police Department (APD) and the

Federal Bureau of Investigation (FBI) began an undercover investigation of Car Shop and Shawn

Bryan.

As part of this investigation, the task force used the confidential informant to make a

number of controlled drug purchases from Gilbert Montoya.  The task force intended to arrest

Montoya after making a series of drug purchases and then attempt to "roll" Montoya to get

information about Shawn Bryan's alleged criminal activity.  During the first controlled purchase,

the informant and Montoya met at a location some distance from Car Shop and the informant

purchased a quarter-pound of marijuana from Montoya.  During the second controlled purchase,

_____

[1]To avoid any potential confusion between the transcripts of the first and second trials,
the transcript of the second trial (Doc. Nos. 147, 151, 154, and 155) will be cited as Trial 2 Tr.

the informant met Montoya at Car Shop and again purchased a quarter-pound of marijuana. Trial 2 Tr. at 39.  During the third controlled purchase, the informant and Montoya met about a block away from Car Shop and the informant purchased twenty bundles of crack cocaine.  Trial 2 Tr. at 43.  The task force planned to make a fourth and final controlled purchase that never occurred due to the events that lead up to Ahrensfield's arrest and prosecution.

In addition to making the controlled drug purchases, the task force also set up surveillance to investigate the allegations that stolen property was being sold and stored at Car Shop.  During the surveillance of Car Shop, the officers noticed that Zach Ahrensfield, Brad Ahrensfield's high school age son, was working at the business.  Because Brad Ahrensfield was an APD officer, one of the investigating officers, Ron Olivas, thought that Ahrensfield should be informed about the ongoing investigation.  Despite being instructed not to inform Ahrensfield about the investigation, Olivas told Ahrensfield about the investigation and helped Ahrensfield devise a story to tell Shawn Bryan that would allow Ahrensfield to get his son to stop working without alerting Bryan to the investigation. At the time that Olivas informed Ahrensfield about the investigation, Olivas was unaware that Ahrensfield and Bryan were close friends.

On September 22, 2010, Ahrensfield called Bryan to advise him that Zach Ahrensfield could no longer work at Car Shop.  In accordance with the plan that Brad Ahrensfield had devised with Olivas, Ahrensfield told Bryan that his son could not work at Car Shop any more because he needed to focus on his school responsibilities.  Later that night, Ahrensfield called Bryan a second time.  This time, however, Ahrensfield called Bryan from a payphone. Ahrensfield asked Bryan to meet on the street outside of Bryan's gated community and advised Bryan to wear a ball cap.  Rather than driving his own truck to pick up Bryan, Ahrensfield drove his girlfriend's Jeep. When Bryan got into the Jeep, Ahrensfield proceeded to tell Bryan about

3

the undercover investigation.  Ahrensfield informed Bryan that APD and the FBI were

conducting an undercover operation at Car Shop, that Bryan was suspected of being the

"sergeant major," or leader, of a crime organization, and that Bryan's mechanic was dealing

drugs. Later that night, after hearing this information, Bryan contacted Darren White, who was

then the Bernalillo County Sheriff, to inquire about why he was under investigation.

The next morning, September 23, 2009, Bryan met with Joe Hudson, who was at that

time the Commander of the Albuquerque Police Department, and asked Hudson about the

undercover investigation.  It became apparent to Hudson from his conversation with Bryan that

Bryan was aware of a number of details of the investigation, and Bryan informed Hudson that he

had learned about the investigation from Ahrensfield.  Later that morning, Hudson and Bryan

met with Robert Smith, who was at that time a Lieutenant with the Albuquerque Police

Department, and Bryan again disclosed a number of details about the covert operation. Because

of Bryan's awareness of the ongoing investigation, the investigation was shut down. Despite

having to shut down the investigation, the task force was still able to arrest and interrogate

Gilbert Montoya.  However, the confidential informant was not able to make a final drug buy

due to the fact that the investigation had been compromised.  Gilbert Montoya did not provide

any information that implicated Shawn Bryan in any criminal activity.

Because Ahrensfield had disclosed the existence of the investigation to Bryan, and

Ahrensfield had therefore compromised the investigation, Ahrensfield was arrested and charged

with one count of obstruction of justice.  Ahrensfield was also charged with one count of

allegedly making false statements to the FBI agents who investigated Ahrensfield's disclosure of

the undercover operation. The case first went to trial in April 2010.  At the conclusion of that

trial, the jury found Ahrensfield not guilty of making false statements but was unable to reach a

verdict on the obstruction of justice charge. *See* Verdict (Doc. No. 57).  As a result, trial was

reset on December 13, 2010 on the remaining obstruction of justice charge.

## DISCUSSION

## I. Certain Impeachment Evidence can be Considered as Substantive Evidence

As an initial matter, the parties disagree about what evidence the Court is permitted to

consider in its review of Ahrensfield's Rule 29 Motion.  During the second trial, the testimony of

Shawn Bryan was inconsistent with the testimony that Bryan gave at the first trial and to the

grand jury.  Because of these differences, the Government used a number of Bryan's prior

statements to impeach Bryan's testimony.  As a result, a significant amount of Bryan's prior

testimony was read into the record at the second trial.  Ahrensfield contends that the prior

testimony was only admissible for impeachment purposes and that the Court is therefore not

permitted to consider as substantive evidence the portions of Bryan's prior testimony that were

read into the record.  The Government, on the other hand, contends that the prior statements it

read into the record are substantive evidence that can be considered in the Court's analysis of

Ahrensfield's Rule 29 Motion.

Rule 801(d)(1)(A) of the Federal Rules of Evidence provides that a prior statement by a

witness is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-

examination concerning the statement" and the statement is "inconsistent with the declarant's

testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other

proceeding, or in a deposition."  As the Tenth Circuit has recognized, when a witness's prior

statements were given under oath and the witness is subject to cross-examination at trial, "the

prior inconsistent statements [a]re not hearsay and [a]re admissible as substantive evidence

under Fed.R.Evid. 801(d)(1)(A)." *United States v. Orr*, 864 F.2d 1505, 1509 (10th Cir. 1988);

*and see* Advisory Committee Notes to Fed. R. Evid. 801(d)(1)(A) (noting that "[p]rior

inconsistent statements traditionally have been admissible to impeach but not as substantive

evidence" but that "[u]nder the rule they are substantive evidence").  Because Bryan was subject

to cross examination at the second trial, and because Bryan's prior inconsistent statements were

made under oath before the grand jury and at the first trial, the Court can consider the statements

Bryan made to the grand jury and at the first trial when determining whether the Government

presented sufficient evidence to support the jury verdict.

 Despite the existence of well settled law that the Court can consider Bryan's prior

inconsistent statements as substantive evidence, Ahrensfield argues in his Reply that the

evidence cannot be considered.  Ahrensfield first argues that the statements Bryan made to the

grand jury cannot be considered because Bryan was "not subject to cross-examination at the

grand jury proceeding."  In making this argument Ahrensfield appears to misunderstand the

cross-examination requirement of Rule 801(d)(1)(A).  Contrary to Ahrensfield's argument, the

Rule only requires that the declarant be subject to cross-examination at the trial in which the

statements are being offered, not at the time that the statements were made.  *See* Rule

801(d)(1)(A).  Since Bryan was subject to cross-examination during the second trial, Rule

801(d)(1)(A)'s cross-examination requirement was met.

 Ahrensfield next argues that some of the prior statements the Government introduced at

trial are not inconsistent with Bryan's testimony in the second trial and that the prior statements

are therefore not admissible.  During the second trial, the Government advised the Court that it

intended to read two pages of Bryan's grand jury testimony into the record under Rule 801.

Ahrensfield  objected, arguing that "there is nothing inconsistent that's been brought out" and

that "[t]his is improper impeachment."  Trial 2 Tr. at 229-230.   When the Government

6

attempted to continue its questioning, the Court advised the parties that "[t]here is an objection to something that has not yet been read, so I don't know how to rule on it because I don't know what it's about." *Id.* at 230.  The Court then instructed the Government on the proper manner in which to impeach Bryan using his prior inconsistent statements.   Subsequently, the Government read a number of Bryan's prior statements from both his grand jury testimony and his testimony in the first trial. Thereafter, Ahrensfield did not renew his objection that nothing inconsistent had been brought out, nor did Ahrensfield make that objection at any other point during the trial.

Because Ahrensfield did not object to the admissibility of Bryan's prior statements, the Court will not consider Ahrensfield's argument that the statements were inadmissible. The statements were read into evidence without objection, they were considered by the jury, and they are a part of the Government's case-in-chief.  The Court is therefore not precluded from considering the prior statements in determining whether the Government introduced sufficient evidence to prove Ahrensfield's guilt.

Ahrensfield next argues that the Government cannot rely on Bryan's confusion and memory problems as the basis for introducing Bryan's prior inconsistent statements. Ahrensfield contends that where memory loss is feigned, prior inconsistent statements are admissible but that where memory loss is real, the prior inconsistent statements are not admissible.  Ahrensfield asserts that because Bryan testified that he suffered a traumatic brain injury during his military service, Bryan's memory problems, and thus the inconsistencies in his testimony, indisputably stem from his brain injury.  However, Ahrensfield did not object to Bryan's statements on the ground that Bryan's memory loss was genuine. The Court therefore did not have the opportunity to rule on the issue of the admissibility of the statements because of memory loss prior to their admission.  Because, during trial, Ahrensfield did not challenge the

admissibility of the prior statements on the basis of memory loss, the Court will not consider Ahrensfield's argument on that ground in this post-trial proceeding.

Finally, Ahrensfield asserts that the statements Bryan made to the FBI cannot be considered by the Court as substantive evidence because Bryan was not under oath during his interview with the FBI. The Court agrees and the statements Bryan made to the FBI will not be considered as substantive evidence by the Court in determining whether the Government introduced sufficient evidence to prove each element of the offense.  Bryan's statements to the grand jury and his testimony during the first trial, on the other hand, were admitted as substantive evidence and they will be considered in the Court's analysis.

## II.        Ahrensfield's Rule 29 Motion

Ahrensfield moves under Fed. R. Crim. P. 29 for a judgment of acquittal, arguing generally that the evidence adduced at trial was insufficient to support a conviction on the obstruction of justice charge.  In deciding a motion for judgment of acquittal based on alleged insufficient evidence, the Court's central inquiry is "whether a reasonable jury could find [the] defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government and drawing reasonable inferences therefrom."  *United States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir.).  It is not the Court's role to "weigh conflicting evidence nor consider the credibility of witnesses."  *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004).  "Instead, [the Court] must simply determine whether [the] evidence, if believed, would establish each element of the crime." *Id.*  (internal citation and quotation marks omitted, second alteration in original).  Additionally, in conducting its inquiry, the Court must be mindful that "[w]hile the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable, and caution must be taken that [a]

8

conviction not be obtained by piling inference on inference." *United States v. Jones*,  44 F.3d 860, 865 (10th Cir. 1995) (internal citation and quotation marks omitted).  Indeed, the evidence "must do more than raise a suspicion of guilt," *United States v. Rakes*, 510 F.3d 1280, 1284 (10th Cir. 2007), and "[a] jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility," *Jones*, 44 F.3d at 865 (internal citation and quotation marks omitted).  However, while "the evidence . . . must be substantial, . . . it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Phillips*, 583 F.3d 1261, 1264 (10th Cir. 2009)(internal citation and quotation marks omitted).

As discussed above, Ahrensfield presented his Motion at the conclusion of the United States' case-in-chief in accordance with Fed. R. Crim. P. 29(a).  As it is permitted to do under Fed. R. Crim. P. 29(b), the Court reserved ruling on Ahrensfield's Motion and submitted the case to the jury.  Rule 29(b) provides that "[i]f the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved."  The Court will conduct its review of the evidence accordingly, reviewing only the evidence presented during the United States' case-in-chief.

As a result of Ahrensfield's disclosure to Shawn Bryan, the United States indicted Ahrensfield for obstruction of justice under 18 U.S.C. § 1512(c)(2).  That section makes it a crime for anyone to corruptly obstruct, impede, or influence any official proceeding or to attempt to do so.  To obtain a conviction for a violation of § 1512(c)(2), the United States was required to prove each of the following elements beyond a reasonable doubt:

1)      the Defendant acted knowingly, that is, voluntarily and intentionally and not by mistake or accident;

9

2)      the Defendant obstructed, influenced, or impeded or attempted to obstruct,
        influence, or impede an official proceeding;

3)      the Defendant acted corruptly, that is, that the Defendant acted knowingly and
        dishonestly with the wrongful purpose to obstruct, influence or impede the due
        administration of justice; and,

4)      the Defendant's alleged actions had a relationship in time, causation, or logic with
        the proceeding such that it was foreseeable that Defendant's conduct would
        interfere with the proceeding.  In other words, the Government must prove
        beyond a reasonable doubt that obstruction of an official proceeding was the
        natural and probable outcome of Defendant's conduct.

*See* 18 U.S.C. § 1512(c)(2); *Philips*, 583 F.3d at 1263-64; Tenth Circuit Pattern Jury Instruction
1.37 (defining "knowingly"); *see also Arthur Anderson, LLP v. United States*, 544 U.S. 696, 705
(2005).

        For purposes of  §1512(c)(2), an "official proceeding" means a proceeding before a judge
or court of the United States or a federal grand jury. 18 U.S.C. §1515(a)(1)(A).  Importantly,
"§1512(c)(2) does not require that the defendant know of the existence of an ongoing official
proceeding," *Philips*, 583 F.3d at 1264, nor does it require that an official proceeding actually
"be pending or about to be instituted at the time of the offense."  18 U.S.C. §1512(f)(1).
"Rather, a conviction under the statute is proper if it is foreseeable that the defendant's conduct
will interfere with an official proceeding."  *Philips*, 583 F.3d at 1264 (citing 18 U.S.C. §1512
(f)(1)).  Additionally, "§1512(g)(1) makes clear that the government need not prove the
defendant knew that the official proceeding at issue was a federal proceeding such as a grand
jury investigation."  *Id*. at 1264-65.  Stated otherwise, the United States must prove that the

10

defendant intended to obstruct, influence or impede "a proceeding that was in fact federal, not
that the defendant knew the proceeding was federal in nature." *See United States v. Ramirez
Umana*, 2010 WL 1141366, at * 5 (W.D.N.C. Mar. 18, 2010) (unpublished).  However, the
official proceeding "must be at least foreseeable to the defendant, because a defendant who
'lacks knowledge that his actions are likely to affect [a] judicial proceeding . . . lacks the
requisite intent to obstruct.'"  *Philips*, 583 F.3d at 1264 (quoting *Arthur Anderson, LLP v. United
States*, 544 U.S. 696, 708 (2005)) (alterations in original).  "Accordingly,   . . . a defendant's
obstructive conduct [must] have a nexus in time, causation, or logic with the proceeding the
defendant is charged with obstructing. . . . In this way, . . . the nexus limitation is best understood
as an articulation of the proof of wrongful intent that will satisfy the *mens rea* requirement of
'corruptly' obstructing."  *Phillips*, 583 F.3d at 1263-64 (internal citations, quotation marks, and
alterations omitted).

        Ahrensfield asserts that the Government presented insufficient evidence in its case-in-
chief to establish each of the elements required for a conviction.  Ahrensfield contends that the
Government failed to prove that he acted knowingly, that he intended to obstruct a proceeding,
that he acted corruptly, or that it was foreseeable to Ahrensfield that his conduct would interfere
with a federal proceeding. Although the evidence in this case presents somewhat of a close call,
the Court concludes that in viewing the evidence in the light most favorable to the Government,
the evidence adduced during the Government's case-in-chief is sufficient to establish beyond a
reasonable doubt each element of the obstruction of justice charge.

**A. Knowingly**

        Ahrensfield first contends that the Government failed to introduce sufficient evidence to
prove that Ahrensfield acted knowingly when he disclosed the existence of the undercover

investigation to Shawn Bryan.[2]  In order to prove this element of the offense, the Government

was required to establish that Ahrensfield "acted knowingly, that is, voluntarily and intentionally

and not by mistake or accident." At trial, Shawn Bryan testified that he received a phone call

from Ahrensfield on the evening of September 22, 2009, Trial 2 Tr. at 198, that Ahrensfield

asked Bryan to walk outside of Bryan's gated community, walk east, and put on a ball cap. *Id.* at

200-201.  When Bryan got into Ahrensfield's vehicle, Ahrensfield told Bryan that he had "heard

a rumor that [Bryan was] a sergeant major of a crime ring."  *Id.* at 220:8-10.   According to

Bryan, Ahrensfield informed Bryan that there was a rumor that one of Bryan's employee's was

dealing drugs, Trial 2 Tr. at 233, that "something was going to go down," *Id.* at 235:23, and that

Bryan was being watched. *Id.* at 237:14. Based on this testimony alone, the Court concludes, as

it did after the first trial, that "Shawn Bryan's testimony that Ahrensfield contacted Bryan,

arranged a meeting between the two, and directly told Bryan various details of the Car Shop

investigation without prompting would lead any reasonable jury to conclude that Ahrensfield

acted knowingly, and not by mistake or accident, in disclosing those details."  August 24, 2010

Memorandum Opinion and Order at 12.

---

[2]Ahrensfield appears to acknowledge that he acted knowingly when he met with Bryan, but argues that he did not knowingly obstruct a proceeding. *See* Rule 29 Motion at 13. Ahrensfield does not, however, cite any authority for his proposition that this element of the offense requires that Ahrensfield knowingly obstruct a proceeding rather than that Ahrensfield merely have acted knowingly.  Because Ahrensfield does not provide any authority, or even argument, regarding this issue, the Court will analyze the "knowingly" element of the offense as the element was submitted to the jury and will thus only address whether there is sufficient evidence that Ahrensfield acted knowingly.  Further, the Court notes that the nexus requirement, which is discussed in more detail later in this opinion, appears to address the concern Ahrensfield raises about knowingly obstructing a proceeding. Thus, as the Court will explain in more detail in its discussion of the nexus element, the Court would find that Ahrensfield knowingly obstructed a proceeding even under Ahrensfield's interpretation of this element of the offense.

**B. Intent to Obstruct**

Ahrensfield next argues that the Government failed to introduce sufficient evidence that Ahrensfield intended to obstruct a proceeding.  Ahrensfield contends that, unlike at the first trial, the Government only introduced evidence at the second trial that Ahrensfield told Bryan that there was a rumor that Bryan was a crime lord and that one of Bryan's employees was selling drugs.  Ahrensfield asserts that because the Government did not introduce any evidence that Ahrensfield identified the employee who was involved, or the identity of the informant, or that an informant was being used, or that the FBI and APD were investigating Bryan, the Government failed to prove that Ahrensfield intended to obstruct a federal proceeding.  The Court agrees that Bryan's testimony at the second trial was much more equivocal with respect to the exact information that Ahrensfield provided to Bryan and that Bryan did not identify Ahrensfield as the individual who provided Bryan with the majority of the details about the undercover operation.  Nevertheless, Bryan's testimony at the second trial undisputedly established that Ahrensfield told Bryan that there was an investigation and that Bryan was suspected of running a criminal enterprise out of Car Shop.  Based on this evidence alone, the Court would conclude that the Government presented sufficient evidence to allow the jury to find that Ahrensfield intended to obstruct an official proceeding when he told Bryan that there was a rumor that Bryan was running a criminal enterprise. Moreover, other evidence reinforces this conclusion.

Viewed in the light most favorable to the Government, the fact that Ahrensfield told Bryan that there was rumor that Bryan was a ringleader of a criminal enterprise is sufficient evidence for a reasonable jury to conclude that Ahrensfield disclosed the rumor to Bryan so that Bryan would forgo engaging in any further illegal activity.  Additionally, a reasonable jury could

13

conclude that Ahrensfield told Bryan about the "rumor" to alert Bryan of the need to minimize the appearance of Bryan's involvement in any criminal activity, such as by destroying or concealing any evidence of wrongdoing, and the need to confer with anyone in his business engaged in criminal activity to do the same.

Furthermore, the Government also presented evidence, by impeaching Bryan's testimony at the second trial with his testimony before the grand jury and his testimony at the first trial, that further supports the conclusion that Ahrensfield intended to obstruct an official proceeding. Through its use of Bryan's grand jury testimony, the Government introduced evidence that Ahrensfield told Bryan there was a confidential informant involved, Trial 2 Tr. at 226:5-8, that Bryan was suspected of being involved with stolen merchandise related offenses, *Id.* at 227:20-25, and that Gilbert Montoya was suspected of dealing large amounts of drugs through the dealership. *Id.* at 228:14-21. In the same manner, the Government presented evidence that Ahrensfield told Bryan that "Gilbert [Montoya] was being looked at and that something was going to go down soon;" a statement Bryan took to mean that Montoya was going to be arrested. Trial 2 Tr. at 235:6-18. Finally, the Government presented evidence from Bryan's grand jury testimony that Ahrensfield had told Bryan that Bryan was possibly being wiretapped and that Bryan was being watched. Trial 2. Tr. at 236:17-22. Viewing these facts in the light most favorable to the Government, the Court concludes that a reasonable jury could find that Ahrensfield provided these specific details about the investigation to Bryan to help Bryan avoid prosecution for any criminal activity in which he may have been involved.

The Court therefore concludes that the Government introduced sufficient evidence that would enable a reasonable jury to conclude that Ahrensfield intentionally obstructed, influenced, or impeded or attempted to obstruct, influence, or impede an official proceeding.

**C. Corruptly**

Ahrensfield next argues that the Government did not introduce sufficient evidence to prove that Ahrensfield acted corruptly when he disclosed the investigation to Bryan. Ahrensfield contends that the evidence in this trial, unlike the evidence in the first trial, did not show that Ahrensfield told Bryan the specific details of the undercover operation, such as the name of the confidential informant or the identity of the individual that was selling drugs. Because the evidence did not show that Ahrensfield gave Bryan specific details about the investigation, Ahrensfield asserts that the Government failed to show that he acted corruptly. The Government, however, notes that the evidence regarding Ahrensfield's conduct prior to disclosing the existence of the investigation to Bryan and Ahrensfield's conduct in the days following his disclosure is sufficient to prove that Ahrensfield acted corruptly. The Court agrees.

Bryan testified that on the night of September 22, 2009, he received a phone call from Ahrensfield. Bryan further testified that he did not recognize the phone number that Ahrensfield was calling from and that it was not the number for Ahrensfield that Bryan had programmed into his phone. Trial 2 Tr. at 198-99. Agent McCandless testified that Ahrensfield later stated that he had called Bryan from a payphone. Trial 2 Tr. at 379. Ahrensfield told Bryan to put on a ball cap, walk outside of Bryan's gated community, and head east. Trial 2 Tr. at 201. Ahrensfield also told Bryan not to bring a cell phone. Trial 2 Tr. at 203:10. Ahrsenfield, who was driving his girlfriend's vehicle rather than his own vehicle, then picked Bryan up and proceeded to disclose the existence of the undercover investigation to Bryan. Trial 2 Tr. at 210. And, as the Court has already discussed, the Government introduced evidence, by way of impeaching Bryan's testimony, that Ahrensfield told Bryan a number of details about the undercover

investigation such as the fact that a confidential informant involved, that Bryan was suspected of being involved with stolen merchandise related offenses, and that Gilbert Montoya was suspected of dealing large amounts of drugs through the dealership.

Ron Olivas testified that he learned on September 23, 2009, the day after Ahrensfield made the disclosure to Bryan, that the investigation of Car Shop had been shut down.  After learning this information, Olivas contacted Ahrensfield and asked him if everything was okay and if Bryan was suspicious based on the conversation Ahrensfield had with Bryan about his son no longer working at Car Shop.  Trial 2 Tr. at 324.  According to Olivas, Ahrensfield stated that everything was okay.  *Id.* At 2:13 a.m. the next morning, Ahrensfield called Olivas from Ahrensfield's girlfriend's cell phone.  Ahrensfield informed Olivas that the FBI had been to Ahrensfield's house and that the agents were asking questions about the Car Shop investigation. According to Olivas, Ahrensfield stated that he had told the FBI agents that he did not have any knowledge of the Car Shop investigation.  Trial 2 Tr. at 327.  Olivas then asked Ahrensfield if Ahrensfield had said anything about the investigation to Bryan.  According to Olivas, Ahrensfield denied having told Bryan anything about the investigation.  Trial 2 Tr. at 330. In addition to the phone call that Olivas received from Ahrensfield, Olivas also received a phone call from Bill Gonzales, a friend of both Ahrensfield and Olivas.  Gonzales called Olivas at around 1:30 in the morning on either September 23 or 24 and gave Olivas a phone number, which apparently was Ahrensfield's girlfriend's number, that Olivas needed to use to contact Ahrensfield.  Trial 2 Tr. at 334.

Bill Gonzales testified that on September 24, 2009, he received a text message from Ahrensfield asking Gonzales to relay a message to Ron Olivas.  Trial 2 Tr. at 351. Ahrensfield asked Gonzales to call Olivas' wife and ask if it was okay to call that number.  Trial 2. Tr. at 352

Because Gonzales did not feel comfortable calling Olivas' wife, Gonzales called Olivas directly and informed him about the messages he had received from Ahrensfield. Trial 2. Tr. at 353. Several days later, Ahrensfield asked Gonzales if he could deliver a cell phone to Olivas that Olivas could use to communicate with Ahrensfield. Trial 2 Tr. at 355. Because Gonzales did not want to get in the middle of everything that was happening, Gonzales declined to deliver the phone for Ahrensfield.

FBI Agent Drew McCandless testified that on September 23, 2009, he went to Ahrensfield's house to interview Ahrensfield about Bryan's knowledge of the undercover investigation. When Agent McCandless asked Ahrensfield if Ahrensfield knew about the undercover investigation, Ahrensfield denied having any knowledge of the investigation. Trial 2 Tr. at 369. When Agent McCandless asked Ahrensfield if he had talked to any SID officers, including Olivas, in the last few days, Ahrensfield stated that he had not spoken to any of the SID officers. Trial 2 Tr. at 369-70. And, when Agent McCandless asked Ahrensfield if he had told Bryan about the investigation, Ahrensfield denied having told Bryan anything about the investigation. Trial 2 Tr. at 370.

Viewing these facts in the light most favorable to the Government, as the Court is required to do, the Court concludes that the jury could reasonably determine that Ahrensfield acted corruptly when he informed Bryan that there was an ongoing undercover investigation of Bryan and Car Shop. The jury could infer from Ahrensfield's behavior the night he met with Bryan—calling from a payphone, arriving in a vehicle not his own, asking Bryan to head east on the street wearing a baseball cap, and advising Bryan not to bring a cell phone—that Ahrensfield was attempting to avoid detection at that meeting. Moreover, the content of Ahrensfield's statements to Bryan also suggest a corrupt purpose when drawing inferences from those

17

statements in the light most favorable to the Government.  Specifically, a jury could reasonably infer from Ahrensfield's disclosure of the investigation of Car Shop and Bryan personally, the use of a confidential informant, and the fact that Gilbert Montoya was going to be arrested, that Ahrensfield wrongfully intended to assist Bryan in evading eventual prosecution, in which a grand jury would necessarily be involved, and alert Bryan of the need to take protective measures, such as destroying evidence and devising explanations for any suspicious activity, if Bryan in fact was engaged in criminal activity.  *United States v. Erickson*, 561 F.3d 1150, 1160 (10th Cir. 2009) (noting that "an act is done 'corruptly' when done with the purpose of obstructing justice"). Further, Ahrensfield's conduct in the days following the disclosure, such as his repeated denials that he said anything to Bryan or that he even knew about the Car Shop investigation and his attempts to relay messages and a cell phone to Olivas, demonstrates a consciousness of guilt from which the jury could infer that Ahrensfield acted corruptly when he informed Bryan about the investigation.  Based on this evidence, the Court concludes that the Government met its burden of providing sufficient evidence to prove that Ahrensfield acted corruptly.

**D. Nexus**

The final element of the offense that Ahrensfield contends the Government failed to prove is whether there was a nexus between Ahrensfield's conduct and the official proceeding. This required the Government to prove that Ahrensfield's conduct had a relationship in time, causation, or logic with the proceeding such that it was foreseeable that Ahrensfield's conduct would interfere with the proceeding.  In other words, the Government was required to prove that at the time Ahrensfield disclosed the existence of the investigation to Bryan, it was foreseeable to Ahrensfield that a federal grand jury would be convened and that Ahrensfield's actions would

interfere with that proceeding.  In his Rule 29 Motion, Ahrensfield contends that in the second

trial, there was no evidence to show that Ahrensfield had notice that a federal proceeding was

going to occur or that such a proceeding was foreseeable to Ahrensfield.  Ahrensfield also

asserts that no grand jury would foreseeably be convened because the small drug purchases the

confidential informant made from Gilbert Montoya were insufficient to warrant federal

prosecution and the Government only hoped that Montoya would be able to provide information

about Bryan's alleged criminal activity that would warrant federal prosecution.

       The Court, however, concludes that the evidence presented in the United States' case-in-

chief was sufficient to establish that an official proceeding would have been foreseeable to

Ahrensfield at the time of his meeting with Bryan.  Ron Olivas testified that he told Ahrensfield

that "it appeared there were narcotics being moved through the Car Shop, they were being sold

out of the Car Shop; [that] there was the potential of some stolen property being at the Car Shop;

and that potentially the owner of the Car Shop was going to be a criminal target of the

investigation."  Trial 2 Tr. at 317:15-21.  Olivas also informed Ahrensfield that controlled

purchases of drugs were being made by a confidential informant, that Gilbert Montoya was

selling the drugs to the informant, that there was a potential financial investigation of Bryan, and

that the FBI was involved in the investigation. Trial 2 Tr. at 317-318. In addition, Agent

McCandless testified that when he interviewed Ahrensfield in November 2009, Ahrensfield

stated that he believed Gilbert Montoya would be arrested for selling drugs to the confidential

informant.  Trial 2 Tr. at 377.  Thus, the evidence suggests that at the time Ahrensfield met with

Bryan, Ahrensfield knew that: (1) the FBI was investigating Car Shop and Shawn Bryan

personally; (2) the task force had successfully purchased narcotics from Montoya; (3) the task

force was using a confidential informant in its investigation; (4) the task force intended to arrest

Gilbert Montoya; and (5) something "was going to go down soon." Trial 2 Tr. at 235:6-18.

Thus, the Government presented evidence that Ahrensfield knew that the investigation of Car Shop was active, not just in its planning stages, and that the investigation had uncovered evidence of ongoing criminal activity at Car Shop.  Further, Ahrensfield's knowledge that something "was going to go down soon" suggests that Ahrensfield knew the task force intended to take some type of overt action that would logically lead to a judicial proceeding. Viewed as a whole, this evidence tends to show that Ahrensfield was aware that the investigation had progressed beyond an exploratory phase and had reached a point where overt action was imminent, making the likelihood of an official proceeding, and particularly a grand jury proceeding, a virtual certainty and not a remote or inconceivable possibility as Ahrensfield suggests.

While the evidence discussed above is sufficient for the Court to conclude that the Government met its burden of establishing the nexus element of the offense, the fact that the commencement of a grand jury was foreseeable to Ahrensfield is further supported by evidence introduced in the Government's case-in-chief regarding Ahrensfield's experience as a law enforcement officer and evidence regarding other law enforcement officers' familiarity with grand jury proceedings.  For example, Ron Olivas testified that ordinarily, a person who sells drugs to a confidential informant is arrested after making a series of controlled sales because the "goal is to effect the arrest on a target if you're buying drugs from that person." Trial 2 Tr. at 345.  Olivas also noted that after a target has been arrested for selling drugs, the case may be presented to a grand jury for an indictment.  Trial 2 Tr. at 345.  Similarly, Bill Gonzales testified that in his experience as an APD officer, anytime someone was arrested for a felony, "it always goes to the grand jury,"  Trial 2 Tr. at 357, and Agent McCandless testified that in his

experience, individuals who sell drugs during controlled purchases are going to be arrested. *Id.*

Having heard testimony from a number of individuals in the law enforcement community that an arrest is a probable consequence of selling drugs to a confidential informant and that presentation of evidence to a grand jury is a probable consequence of that arrest, and having heard testimony that Ahrensfield was a member of the law enforcement community, the jury could reasonably infer that Ahrensfield was aware that Gilbert Montoya would be arrested and that a grand jury might be convened.  This is especially true in light of Ahrensfield's statement to Bryan that something was "going to go down soon."

Despite the evidence presented in the Government's case-in-chief from which the jury could infer that a federal proceeding was foreseeable to Ahrensfield, Ahrensfield nevertheless argues that no grand jury could foreseeably be convened because the "ultimate goal of the investigation was a hope that Montoya would implicate Bryan in criminal activity that could potentially empanel a grand jury investigation."  Motion at 19.  The Court thoroughly addressed this argument in its August 24, 2010 Memorandum Opinion and Order denying the Rule 29 motion that Ahrensfield filed during the first trial, and the Court will therefore not reexamine this issue.  As the Court explained in its prior opinion, "that the task force had not developed a case against Bryan ready for prosecution at the time Ahrensfield disclosed details of the investigation is immaterial to whether a federal grand jury would have commenced." August 24, 2010 Memorandum Opinion and Order at 24.  Further, because the "foreseeability element relates to the commencement of the proceeding itself, [and] not to the eventual result of that proceeding . . . , the sufficiency of the evidence against Bryan is not determinative of the foreseeability of an official proceeding arising from the investigation of Bryan and Car Shop. Regardless of the strength of the evidence against Bryan, a jury could reasonably conclude,

based on the evidence discussed above, that Ahrensfield's disclosure of the existence of the investigation to Bryan prevented a grand jury from ever commencing given the highly detrimental impact that disclosure had on the underlying investigation and that this result was foreseeable to Ahrensfield at the time he made the disclosure." *Id.*

Finally, Ahrensfield contends that §1512(c)(2) does not criminalize the obstruction of an investigation and that because Ahrensfield's conduct only interfered with an investigation, Ahrensfield cannot be convicted of obstruction of justice. It is true that the United States Supreme Court has noted that "it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." *United States v. Aguilar*, 515 U.S. 593, 599 (1995). While this statement alone might appear to indicate that interfering with an investigation is insufficient to constitute a violation of §1512(c)(2), the statement must be read in the context of the remainder of the *Aguilar* opinion. As the Court has already noted, the United States Supreme Court in *Aguilar*, held that a defendant's conduct "must have the natural and probable effect of interfering with the due administration of justice" and that while the "defendant's actions need not be successful . . . if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct."

The Supreme Court then applied this newly articulated test to determine whether the defendant's conduct—making false statements to an FBI agent who may or may not have been called to testify before the grand jury—constituted obstruction of justice. In concluding that the defendant's conduct did not violate the statute, the Supreme Court distinguished between false statements made to an investigating agent and false statements made to the grand jury by noting that making false statements to the grand jury "all but assures that the grand jury will consider

the material in its deliberations" but that the "use [that] will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is far more speculative" and "cannot be said to have the 'natural and probable effect' of interfering with the due administration of justice." *Id.* at 601. Thus, what was important to the Supreme Court's analysis was not so much the precise phase of the investigation during which the false statements were made, but rather the effect the statements could have on the grand jury and the defendant's knowledge that the statements would have such an effect.

Here, Ahrensfield's conduct indisputably occurred during an investigation. However, unlike the defendant's conduct in *Aguilar* of making false statements to an investigating officer that might or might not be called before the grand jury, Ahrensfield's disclosure of the investigation to the target of the investigation had the "natural and probable effect" of interfering with the due administration of justice because, as the Court has already explained, revealing the existence of an investigation to the target of the investigation precludes the investigation from meaningfully moving forward and thus precludes the grand jury from ever even considering the case. It is not that Ahrensfield's conduct merely interfered with or influenced an investigation, but that Ahrensfield's conduct interfered with an investigation in such a significant manner that the investigation, and therefore the grand jury proceedings that would have resulted from that investigation, had to be terminated. And, given Ahrensfield's knowledge of the steps that had already been taken in the investigation and Ahrensfield's knowledge that such cases are typically referred to the grand jury, Ahrensfield had knowledge that his actions were likely to affect a federal proceeding.

Thus, viewing the evidence as a whole in the light most favorable to the Government, the Court concludes that a jury could reasonably find Ahrensfield guilty beyond a reasonable doubt

of violating §1512(c)(2) and the Court therefore concludes that Ahrensfield's Rule 29 Motion should be denied.

**IT IS ORDERED THAT** Defendant Brad Ahrensfield's Motion for Judgment of Acquittal on the Charge of Obstruction of Justice (Doc. No. 158) is DENIED.


_____

SENIOR UNITED STATES DISTRICT COURT JUDGE